IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

DONTIEZ PENDERGRASS and
SHAWN THOMAS,

       Defendants.

CRIMINAL ACTION FILE NO.

1:17-CR-315-LMM-JKL

## FINAL REPORT AND RECOMMENDATION

On September 6, 2017, a federal grand jury seated in the Northern District of Georgia returned a ten-count indictment charging Defendants Dontiez Pendergrass and Shawn Thomas in connection with the armed robberies of three restaurants, a grocery, and a laundromat in the metropolitan Atlanta area. [*See* Doc. 1.] Pendergrass is charged with Hobbs Act robbery in violation of 18 U.S.C. § 1951 and corresponding firearm offenses with respect to (1) the November 19, 2016 armed robbery of the China Star Restaurant in Tucker, Georgia; (2) the December 24, 2016 armed robbery of Polo's Taqueria in Lawrenceville, Georgia; (3) the January 1, 2017 armed robbery of Discount Grocery in Tucker; (4) the January 4, 2017 armed robbery of the Bonita Coin Laundry in Lilburn, Georgia;

and (5) the January 15, 2017 armed robbery of the Best Wings restaurant in Lawrenceville. [*Id.*] Thomas is charged with Hobbs Act robbery and corresponding firearm charges with respect to the Polo's Taqueria and Discount Grocery robberies.

Pendergrass and Thomas have filed the following pretrial motions, which are presently pending before the Court:

- Thomas's Motion to Suppress Evidence Seized Pursuant to Unconstitutional Search Warrants [Doc. 34];

- Thomas's Motion to Suppress Identification Testimony [Doc. 35];

- Pendergrass's Omnibus Motion to Suppress Evidence [Doc. 37]; and

- Pendergrass's Amended Motion to Suppress [Doc. 41].

On February 20, 2018, I held an evidentiary hearing on those motions. [Doc. 48 (hearing exhibits); Doc. 49 (transcript of hearing).] The following witnesses testified at the hearing: (1) Shanavia McCall, a former neighbor of Defendant Thomas; (2) FBI Special Agent Matthew Winn; (3) Jason Cabrera, an Assistant Chief Community Supervision Officer with the Georgia State Department of Community Supervision; (4) Detective Brian Dorminy, a detective with the

2

Gwinnett County, Georgia, Police Department; (5) Anquaneice Jones, Defendant Pendergrass's ex-girlfriend; and (6) Alicia Jones, Anquaneice Jones's mother.

Pendergrass and Thomas filed post-hearing briefs in support of their motions [Docs. 54, 55], the government has filed an omnibus response in opposition [Doc. 62], and Pendergrass and Thomas have each filed reply briefs [Docs. 64, 66]. Pendergrass and the government also filed supplemental briefs concerning the application of the recent United States Supreme Court decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), to Pendergrass' motion to suppress evidence the government obtained through a "tower dump." [*See* Docs. 72, 73, 74, 79.]

The motions are now ripe for resolution. In this Report and Recommendation, I summarize the facts pertinent to the issues before the Court. I then address Pendergrass's motions to suppress, Thomas's motion to suppress evidence, and, finally, Thomas's motion to suppress identifications. For the reasons that follow, I **RECOMMEND** that Thomas's motions be **DENIED** and that Pendergrass's motions be **GRANTED IN PART**, as to the evidence obtained from the LG Cell Phone seized on March 10, 2017, and **DENIED IN PART**, in all other respects.

3

I.      **Background**

A.      **The March 10, 2017 Shooting of Dontiez Pendergrass**

In the early morning hours of March 10, 2017, Detective Dorminy with the Gwinnett Police Department was called to Gwinnett Medical Center to investigate the shooting of Defendant Pendergrass, who had been shot earlier that morning. [Doc. 49 at 143-44.]   When Detective Dorminy arrived at the hospital, he was unable to interview Pendergrass because Pendergrass was in critical condition, but he did interview Anquaneice Jones, Pendergrass's then-girlfriend, who was present at the hospital.  [*Id.* at 144, 164.]   She told Detective Dorminy that earlier that evening, she was at her home on Wenham Lane in Lawrenceville, Georgia, when a man came to her door and told her that Pendergrass had been shot and that he was at the entrance of the subdivision.  [*Id.* at 144.]   She ran to the entrance and found that a Good Samaritan (later identified as McCall) had taken Pendergrass to the hospital.[1]   [*Id.*]   She told Detective Dorminy that Pendergrass lived at the Wenham

-----

[1] Detective Dorminy's recollection at the hearing that Pendergrass had already been picked up by a Good Samaritan by the time Anquaneice Jones arrived at the scene appears to have been mistaken.  Anquaneice Jones testified that when she arrived at the scene, McCall (whom she had not met before) was there and offered to take Pendergrass and Anquaneice to the hospital.  [Doc. 49 at 162-63.] Anquaneice Jones accepted the offer.  [*Id.* at 162.]   Anquaneice Jones's testimony is also consistent with Detective Dorminy's affidavit dated March 10, 2017, supporting his application for a warrant to search a Porsche Cayenne.  [*See* Doc.

Lane residence and that he drove a gold Porsche Cayenne.  [*Id.* at 145.]  She also gave Detective Dorminy Pendergrass's phone number.  [*Id.* at 144-45.]

Later on the morning of March 10, Detective Dorminy interviewed McCall at the Gwinnett Detention Center.  [Doc. 49 at 17, 144.]  She reported that on the evening of March 9 or the early morning of March 10, she was driving and received a call from Defendant Thomas, whom she also knew by the nickname "Face."  [*Id.* at 10, 145.]  She stated that "Face" told her that he had been shot near Lawrenceville Highway and Patterson Road in Gwinnett County.  [*Id.* at 145; *see also id.* at 6.]  McCall drove to the location, only to find that it was not "Face" who had been shot, but instead another man, later identified as Pendergrass.  [*Id.* at 145; *see also id.* at 6.]  She then drove Pendergrass to the hospital.  [*See id.* at 12, 145.]

After interviewing Anquaneice Jones and McCall, Detective Dorminy drove to the location of the shooting and found the gold Porsche Cayenne about 200 feet from the area where McCall said she had picked up Pendergrass.  [Doc. 49 at 145-46, 159.]  He impounded the vehicle and transported it to Gwinnett County Police

---

41-1 at 2 (stating that McCall transported Pendergrass and Anquaneice Jones to the hospital).]  How Anquaneice Jones got to the hospital is has no bearing on the substantive issues raised in the defendants' motions; the Court provides this discussion for context.

Headquarters.  [*Id.* at 146.]  He then obtained a search warrant for the vehicle from a state court judge, which authorized him to search the vehicle for "handguns, long guns, drugs, bullets, blood and/or DNA."  [Doc. 41-1 at 1.]  During the search, he seized ammunition, a firearm, and an unspecified quantity of green leafy material, and took samples for DNA testing.  [Doc. 49 at 146; Doc. 41-1 at 7 (inventory of search).]  He also seized a gold LG cell phone from a pocket behind the front passenger seat.  [Doc. 49 at 146; *see also* Doc. 41-1 at 7.]  He did not know to whom the phone belonged but presumed that the phone would have a "wealth of information in it" as it could have belonged to the victim, a witness, or a suspect. [Doc. 49 at 146.]  He did not look through the contents of the phone at the time he seized it.  [*Id.* at 147.]  The Cayenne was then released to Pendergrass's mother, the registered owner of the vehicle.  [*Id.*]

On March 15, 2017, Detective Dorminy interviewed Pendergrass about the shooting.  [Doc. 49 at 147.]  Pendergrass stated that he had come to the subdivision to meet a friend of Anquaneice Jones, and while he was standing outside, a white male came out of the darkness, said "what's up," and pulled out a gun.  [*Id.*] Pendergrass fled but was shot in the buttocks.  [*Id.* at 147-48.]  Pendergrass said that there were two other individuals present at the scene, but he gave only their

nicknames to Detective Dorminy.  [*Id.* at 148, 161.]  One of the individuals that Pendergrass identified was "Face."  [*Id.* at 161.]

### B.      The March 30, 2017 Search of the Wenham Lane Residence

Meanwhile, in early 2017, the FBI was investigating a string of robberies that occurred in Tennessee and Georgia between mid-2016 and January 2017, including five in Gwinnett County. [Doc. 49 at 41.] Sometime in mid to late March 2017, FBI Special Agent Matthew Winn obtained a court order for a "tower dump" near the robbery locations for the robberies that he was investigating.[2]  [*Id.* at 47, 76.]  The tower dump revealed that a phone number had been in the vicinity of three of the robberies close in time to the robberies.  [*Id.* at 76.] SA Winn gave the phone number to the Gwinnett County Police Department, which responded that the number was associated with Pendergrass and that he had been shot on March 10.  [*Id.* at 76-77, 82.]  SA Winn concluded that Pendergrass was likely present in the vicinity of three of the Gwinnett County robbery locations near the time of the robberies.  [*Id.* at 48.]

---

[2] In a "tower dump," cell service companies provide data identifying all the cell phone numbers that used particular cell phone antennas at a specific location during a specific window of time.  [Doc. 49 at 47.]

SA Winn then obtained the police report for the March 10 shooting and learned that Pendergrass reportedly lived at the Wenham Lane residence. [Doc. 49 at 49-50.]   SA Winn conducted surveillance of the address and observed Pendergrass going back and forth between the residence and a gold Porsche Cayenne parked at the house that was registered to Pendergrass's mother.  [*Id.* at 50, 60.]  SA Winn noticed that Pendergrass matched the physical description of one of the robbers in his investigation.  [*Id.*]  In addition, the last of the string of robberies that SA Winn was investigating occurred on January 15, 2017, at the Best Wings restaurant located approximately one third of a mile from the residence.[3] After that robbery, the robbers fled from the scene and hopped a fence into the neighborhood, in the direction of the Wenham Lane residence.  [*Id.* at 50-51.]

After SA Winn identified Pendergrass at the residence, SA Winn checked Pendergrass's criminal history and learned that he was on probation.  [Doc. 49 at 52.]   SA Winn contacted the Georgia state probation office and advised that Pendergrass was a potential suspect in his investigation and that he appeared to be living at a residence that was not the address he had listed on file with probation.

---

[3] Pendergrass and Thomas are charged with Hobbs Act robbery and corresponding firearm offenses in connection with the January 15, 2017 robbery of the Best Wings restaurant.

8

[*Id.* at 53.]  SA Winn did not ask probation to do anything with the information, as it was against FBI policy to ask them to take action.  [*Id.*]

On the morning of March 30, 2017, at least five probation officers went to the Wenham Lane residence to conduct a field visit on Pendergrass.  [Doc. 49 at 54, 87.]  SA Winn accompanied the probation officers on the visit, with their permission.  [*Id.* at 54, 83, 86.]  Probation Officer Jason Cabrera led the entry team of officers to the front door of the residence and knocked on the door.  [*Id.* at 55, 119.]  A woman answered, and when she opened the door, a strong odor of marijuana came out from inside the house.[4]  [*Id.*]  Officer Cabrera introduced himself and told her that they were there to visit with Pendergrass.  [*Id.* at 55-56, 87, 120.]  She responded that Pendergrass was in the basement or that he was in the house.  [*Id.* at 56, 120.]  Leaving the front door open, she turned and walked back into the house.  [*Id.* at 120.]  The officers then entered the house.[5]  As the

_____

[4] Anquaneice Jones, who was present at the house that morning denies that the house smelled of marijuana or that anyone inside the house was smoking marijuana.  [Doc. 49 at 167.]  Her mother, Alicia Jones, who also lived at the residence, also denies smelling or seeing anyone smoking marijuana that morning.  [*Id.* at 172.]  For the reasons discussed in Part II.D.1. *infra*, I credit Officer Cabrera's and SA Winn's testimony that they smelled marijuana when the door to the house was opened.

[5] The record is unclear how long the officers waited before entering the house.  SA Winn testified that after Officer Cabrera spoke with the woman, several

officers were going down the basement stairs, the woman who answered the door was coming up the stairs. Officer Cabrera told her that he needed to see Pendergrass, and the woman turned around and allowed the officers to follow her into the basement. [*Id.*]

The officers encountered Pendergrass in the basement, and he became belligerent. [Doc. 49 at 57, 121.] One of the officers placed him in handcuffs. [*Id.* at 57.] The officers also conducted a safety sweep of the residence. [*Id.* at 57, 95, 124.] In the garage, officers noticed burnt marijuana roaches and loose tobacco that had been cut out of a cigar, which is consistent with rolling marijuana blunts out of cigar wrappers. [*Id.* at 95-97.] Officer Cabrera decided to obtain a search warrant for marijuana and related paraphernalia. [*Id.* at 57, 124.] While officers waited for the search warrant to be issued, they removed all the occupants of the house and detained Pendergrass. [*Id.* at 58, 100, 123, 137.]

---

of the probation officers followed her into the house, and SA Winn followed them. [Doc. 49 at 88.] Officer Cabrera testified that the woman left the officers standing at the door and that they remained there for some period of time. [*Id.* at 120.] Regardless of whether the officers followed the woman into the house immediately or whether they waited, there is no indication that she affirmatively communicated consent for the officers to enter the house; even so, did she put up any sort of resistance to any of the officers entering the residence. [*Id.* at 57, 88-89, 123.]

At approximately 10:31 a.m., a state court magistrate issued a warrant (the "First Wenham Lane Warrant") authorizing the search and seizure of marijuana, drug scales, small plastic bags, and ledgers at the Wenham Lane residence.  (Gov't Ex. 11 [Doc. 48-5 at 1-7) (search warrant and application).)  Officers from the Gwinnett County Police Department and SA Winn then searched the residence and found drugs, as well as a shirt that appeared to match a shirt depicted in surveillance video of two of the robberies, a single strap crosschest backpack that was depicted in several of the robberies, ammunition, a scope for a rifle, a police scanner, and a ballistic vest or body armor that said "Atlanta Police" on the front.  [*Id.* at 58-59, 110.]  SA Winn found the shirt on the top of a hamper in Pendergrass's bedroom, and the crosschest backpack in the corner of a common room in the basement.  [*Id.* at 62-64.]  The ammunition was found on top of a refrigerator in the kitchen area of the basement, and the scope was found on a counter in the kitchen. [*Id.* at 113.]  Law enforcement did not seize any of the items other than the drugs at that time; rather, law enforcement obtained a second search warrant (the "Second Wenham Lane Warrant") specifically authorizing their seizure.  [*Id.* at 59]; (Gov't Ex. 12 [Doc. 48-5 at 8-14]).

11

SA Winn then went to the Porsche Cayenne parked in the street in front of the residence and observed through the windows a handgun and what appeared to be a rifle case that could hold an AR-15-style rifle, one of the weapons used in the robberies.  [Doc. 49 at 60-62.]  SA Winn related this information to Detective Dorminy, who based on this information, applied for and obtained a search warrant for the Cayenne.  [*Id.* at 60]; (Gov't Ex. 13 [Doc. 48-5 at 15-21]).

On April 11, 2017, Detective Dorminy obtained a search warrant for the LG cell phone that he had seized from the Cayenne on March 10, 2017.  [Doc. 49 at 149.]  According to Detective Dorminy, he waited until April 11 to obtain a search warrant because he had other investigations that were pending simultaneously. [*Id.*]

## C.    May 2017 Interview of Anquaneice Jones

In May 2017, SA Winn and Detective Dorminy interviewed Anquaneice Jones at the Gwinnett County Police Department.  [Doc. 49 at 36.]  SA Winn told her that he wanted to talk to her about the fact that Pendergrass had been arrested. [*Id.*]  During the interview, SA Winn asked if she knew of someone named "Face," and in response she asked SA Winn if he was referring to "Little."  [*Id.* at 36-37];

12

(Gov't Ex. 5 at 3:45-50[6]).  SA Winn responded that he did not know who "Little"

was, and Anquaneice Jones indicted that she was "pretty sure" that "Little" and

"Face" were the same person, whom she described as a young African-American

man in his early 20's, of a short and slim build with a noticeable scar or burn-mark

on his face.  (Gov't Ex. 5 at 3:50-4:10, 4:45-5:30.)  Anquaneice Jones told SA Winn

that she had seen him several times and that she would be able to recognize him.

(*Id.* at 5:30-40.)  SA Winn then showed Anquaneice Jones a picture of Thomas,

whom she identified as "Little."  (*Id.* at 5:54-56.)  She denied knowing that he had

a tattoo on his chest but told SA Winn and Detective Dorminy that she distinctly

recalled the facial scar, because she was curious to know how he got it but did not

want to ask him about it.  (*Id.* at 6:06-12.)

_____

[6] At the evidentiary hearing, the Government introduced approximately six
minutes of Anquaneice Jones's interview, rather than the full video.  Thomas
objected to the Government not providing the full video because other portions of
the video may have had bearing on Anquaneice Jones's identification.  The Court
overruled that objection based on the representation of the government that the rest
of the interview had nothing to do with Thomas.  [Doc. 49 at 175-76.]  In his post-
hearing brief, Thomas renews his objection.  [*See* Doc. 54 at 7 n.1.]  The Court sees
no reason to revisit its ruling and, therefore, overrules the renewed objection to the
government's video.

### D.     June 2017 Interview of McCall

In June 2017, SA Winn and another FBI agent interviewed McCall at her residence.  [Doc. 49 at 18, 29.]  SA Winn told her that he was following up on a Gwinnett County Police Department case in which she had driven a shooting victim to the hospital in March 2017.  [*Id.* at 29.]  McCall recounted the events of March 10.  [*Id.* at 30.]  During the interview, McCall referred to Thomas as "Face," and in response to SA Winn's question as to Face's real name, she stated that his name was "Shawn" but that she did not know his last name.  [*Id.* at 30-31.]  She stated that she communicated with "Shawn" via Facebook, and then, using her phone, pulled up "Shawn's" Facebook page, which identified Shawn's full name.  [*Id.* at 31.]  McCall believes that she may have given the agents a physical description of Thomas, including that he was not much taller than her height of five feet, four inches, he had brown skin, and a scar on his face.  [*Id.* at 21-22.]

After McCall had showed SA Winn Thomas's Facebook profile, SA Winn showed her a photograph of a Shawn Thomas from the Georgia Department of Drivers Services.  [Doc. 49 at 31; *see also* Gov't Ex 2 [Doc. 48-2 at 1].]  McCall identified the individual in the photograph as "Face."  [Doc. 49 at 32.]  SA Winn showed McCall two videos to see if she could recognize anyone in the videos.  [*Id.*]  She viewed the videos once.  [*Id.* at 19.]  SA Winn did not tell McCall who she

14

thought would be in the videos. [*Id.* at 20, 32.] She identified Thomas as one of the robbers in the videos, calling him both "Face" and "Shawn." [*Id.* at 19, 33-34.] Though the robbers were masked in the videos, McCall recognized Thomas because of the shoes that he was wearing, his mannerisms, and his eyes. [*Id.* at 14-15, 20-21.] She explained: "It was just the way he walked, the way he moved, and to me in the video it looked as if he tensed up, and . . . being around a person for so long, you notice certain things, and it was one incident that [Thomas] and I was in, and the way he tensed up in the video is the same way he tensed up and react[ed] in this other situation that we [were] involved in." [*Id.* at 20.] After viewing the videos, she was 100% certain that it was Thomas in the videos because of his distinctive shoes. [*Id.* at 22.]

McCall was not paid for the information that she shared with SA Winn in that interview. [Doc. 49 at 34.] She was paid, however, for information that she provided in subsequent interviews. [*Id.* at 34-35.]

**E.     The June 2017 Search Warrants of Thomas's Residence, Cell Phone, and Facebook Account.**

On June 14, 2017, United States Magistrate Judge Russell G. Vineyard signed a search warrant for Thomas's residence on Cannonball Court in Lawrenceville, Georgia. (Gov't Ex. 6 [Doc. 48-3 at 1-14] (residence warrant and

warrant application).)  During execution of the warrant, agents recovered an LG cell phone and a pair of black sweatpants with white stripes along the leg.  On July 5, 2017, SA Winn applied for and obtained search warrants from United States Magistrate Judge Alan J. Baverman for the LG cell phone and for Thomas's Facebook account.  (Gov't Ex. 7 [Doc. 48-3 at 15-36] (Facebook warrant and warrant application); Gov't Ex. 8 [Doc. 48-3 at 37-56] (cell phone warrant and warrant application).)

Additional facts are discussed as appropriate in the discussion that follows.

## II.    Pendergrass's Omnibus Motion to Suppress Evidence [37] and Amended Motion to Suppress [41]

Pendergrass moves to suppress virtually all evidence that law enforcement obtained in its investigation of the March 10 shooting and the armed robberies that form the basis of the indictment.  Specifically, Pendergrass challenges

(1) evidence seized from the Porsche Cayenne on March 10, 2017, pursuant to the state court warrant that Detective Dorminy obtained to search the vehicle;

(2) evidence seized from the search of an LG cell phone that Detective Dorminy recovered from the Porsche Cayenne on March 10, 2017;

(3) evidence seized from a search of Pendergrass's residence at Wenham Lane residence on March 30, 2017;

16

(4) evidence seized from the Porsche Cayenne on March 30, 2017; and

(5) cell tower dumps that the government obtained pursuant to a court order.

The Court addresses each of these categories of evidence in turn.

### A.    Standard for Reviewing Search Warrants

A judicial officer considering an application for a search warrant must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him or her, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The Eleventh Circuit has "established the following guidelines for determining the validity of a warrant affidavit: (1) demonstration of a connection between the defendant and the location to be searched; (2) demonstration of a link between the location and criminal activity; and (3) demonstration of the informant's veracity and basis of knowledge." *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir. 2002) (per curiam).

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant and its supporting affidavit as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing

17

> courts alike must strike a delicate balance between
> constitutional guarantees against excessive intrusions
> into areas of individual freedom and the Government's
> need to access and to secure relevant evidence in criminal
> prosecutions.  In particular, issuing magistrates are given
> the unenviable task of making "firing line" decisions that
> attempt to encourage availment of the warrant process
> while simultaneously striving to protect citizens from
> unwarranted governmental interference.  In recognition
> of the difficulty inherent in discharging this
> responsibility, reviewing courts lend substantial
> deference to an issuing magistrate's probable cause
> determinations.

*United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994).  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  *Id*. at 1361.

## B.     The First Search of the Porsche Cayenne

On March 10, 2017, Officer Dorminy applied for and obtained a search warrant from a state court magistrate authorizing law enforcement to search the Porsche Cayenne for evidence relating to the shooting of Pendergrass, namely "handguns, long guns, drugs, bullets, blood and/or DNA."  [*See* Doc. 41-1 (copy of search warrant and application for search of vehicle).]  Later that day, he

searched the vehicle and recovered, among other things, an LG cell phone. [*See* Doc. 41-1 at 7 (inventory of search of vehicle).]

Pendergrass argues that all evidence seized from the vehicle should be suppressed because the search warrant application failed to establish probable cause to "search or seize" the vehicle. [Doc. 55 at 5-6.] In support of his argument, he cites Anquaneice Jones's testimony at the evidentiary hearing that she did not see the vehicle when she ran to the scene of the shooting on March 10. [*Id.* at 6.] Based on this testimony, Pendergrass contends that Detective Dorminy's testimony that the car was 200 feet from where Pendergrass was shot "has no basis in fact." [*Id.* at 5-6.]

The Court has reviewed the affidavit that Detective Dorminy presented to the state court judge and readily concludes that the affidavit established probable cause to search the vehicle. In giving a detailed account of the events of March 10, 2017, Detective Dorminy wrote that Anquaneice Jones told him the last time she had seen Pendergrass before he was shot was as he was driving away in a gold Porsche Cayenne at around 7:00 or 8:00 p.m. on March 9, 2017. [Doc. 41-1 at 2.] He also wrote that he found the vehicle near the location where McCall picked Pendergrass up to drive him to the hospital. [*Id.*] It is therefore reasonable to

conclude, based on the totality of the information presented in Detective Dorminy's affidavit, that the vehicle would contain evidence bearing on the shooting of Mr. Pendergrass.

Nor is the Court persuaded by Pendergrass's argument that Detective Dorminy's statement that the car was found 200 feet from the shooting "has no basis in fact.".  Anquaneice Jones testified that when she ran to find Pendergrass in the early morning hours of March 10, she was not thinking about the Porsche; rather, she was trying to get Pendergrass medical attention.  [Doc. 49 at 165.]  Moreover, the record evidence does not indicate that the shooting occurred near Pendergrass's residence or that McCall found Pendergrass near his residence; thus, the Porsche would not necessarily have been nearby when Anquaneice Jones ran out to meet him.  [*See* Doc. 49 at 144-45.]

### C.    The Search of the LG Cell Phone Seized From the Cayenne

Pendergrass also moves to suppress evidence seized from the LG cell phone that Detective Dorminy seized from the Cayenne on March 10 on the grounds that Detective Dorminy unreasonably waited 32 days to obtain a warrant to search the phone.  [Doc. 55 at 6-8.]  In its response, the government argues that the delay was not unreasonable, and that the contents of the phone should not be suppressed. Though not raised by Pendergrass, the government also recognizes in its brief that

the phone was not among the items described in the search warrant that could be seized.[7] [Doc. 62 at 18.]  The government argues that the phone was nonetheless lawfully seized because under the plain view doctrine because Detective Dorminy found the phone while searching for the specifically-enumerated items in the warrant in a place where it would be reasonable to find those items.  [*Id.* at 18-19.]

In reply, Pendergrass argues that the plain view doctrine does not justify the seizure of the phone because law enforcement lacked probable cause to believe that the cell phone was contraband or had any connection to Pendergrass's shooting. [Doc. 66 at 2-3.]  Pendergrass also reiterates that the delay in obtaining the warrant to search the phone was unreasonable.  [*Id.* at 3-4.]

The Court first addresses whether the phone was lawfully seized under the plain view doctrine and concludes that it was not.  Thus, the Court need not address whether the government's delay in obtaining a search warrant to search the contents of the phone was unreasonable.

---

[7] The Court pauses to note that Pendergrass does not raise this in his motions or post-hearing brief; rather, the government (to its credit) brought this issue to the Court's attention in its response brief.  Thus, the Court could find that Pendergrass waived this argument by not properly raising it.  The Court nonetheless addresses the applicability of the plain view doctrine because the parties have sufficiently briefed the issue for the Court's review.

"The Fourth Amendment requires that a warrant particularly describe the place to be searched and the items or persons to be seized; exploratory rummaging is prohibited." *United States v. Jenkins*, 901 F.2d 1075, 1081 (11th Cir. 1990). Thus, only items described in the search warrant may be seized. *Id.* The plain view doctrine provides an exception to this rule, permitting the seizure of evidence in a "situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Horton v. California*, 496 U.S. 128, 135 (1990) (quotation omitted); *see also Jenkins*, 901 F.2d at 1081. A "plain view" seizure is lawful if (1) the officer lawfully was in a position to view the item, and (2) the incriminating nature of the item was immediately apparent. *Fish v. Brown*, 838 F.3d 1153, 1166 (11th Cir. 2016); *see also Horton*, 496 U.S. at 136.

Relying on *Jenkins*, the government contends that the seizure of the cell phone found in the Porsche Cayenne was lawful simply because the phone had "evidentiary value." [Doc. 62 at 19.] But the government frames the standard far too broadly. The appropriate inquiry is not merely whether a particular item might provide a clue helpful to a criminal investigation, but instead is whether there is probable cause to believe that the item is evidence of a crime. *See Jenkins*, 901

22

F.2d. at 1082 (to justify the warrantless seizure of property in plain view, "officers must have probable cause to believe that the items are evidence of the crime") (citing *Arizona v. Hicks*, 480 U.S. 321 (1987)).   "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point."   *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).   "The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment."   *Id.*   "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character [is not] immediately apparent—the plain-view doctrine cannot justify its seizure."   *Id.* (quotation omitted); *see also United States v. Lall*, 607 F.3d 1277, 1291 (11th Cir. 2010).

In other words, the "immediately apparent" requirement depends on whether law enforcement had probable cause to believe that the item would be evidence of

23

a crime. *See United States v. Smith*, 459 F.3d 1276, 1292 (11th Cir. 2006) ("[T]he scope of the "plain view" doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant."); *United States v. Blum*, 753 F.2d 999, 1002 (11th Cir. 1985) (agreeing with the government's argument that the immediately apparent requirement requires only that law enforcement have probable cause to believe items are associated with criminal activity and that probable cause requires facts sufficient to 'warrant a man of reasonable caution in the belief . . . . that certain items may be . . . useful as evidence of a crime.'"). As the Supreme Court stated in *Texas v. Brown*:

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" that certain items may be contraband or stolen property ***or useful as evidence of a crime***; it does not demand any showing that such a belief be correct or more likely true than false.

460 U.S. 730, 742 (1983) (emphasis added) (citation omitted).

Here, the parties do not dispute that Detective Dorminy had lawful access the Porsche Cayenne when he seized the cell phone. Nor do the parties dispute that the cell phone was outside the scope of the warrant. The parties dispute, however, whether the incriminating nature of the cell phone was "immediately apparent." The government contends that Detective Dorminy was justified in his decision to

24

seize the phone because, in his experience, cell phones contain a wealth of information, and the cell phone could contain clues as to who shot Pendergrass. [Doc. 62 at 19.] Pendergrass argues that the plain view doctrine does not justify the seizure of the phone because law enforcement lacked probable cause to believe that the cell phone was contraband or had any connection to Pendergrass's shooting. [Doc. 66 at 2.]

At the outset, the Court notes that the government has the burden of proving that a warrantless seizure is reasonable. *See, e.g.*, *United States v. Bachner*, 706 F.2d 1121, 1126 (11th Cir. 1983). Because the ordinary rule is that only items listed in a search warrant may be seized, *United States v. Johnson*, 713 F.2d 654, 660 (11th Cir. 1983), the government bears the burden of showing that the seizure of items not listed in a search warrant was lawful. This is a close call, but the Court cannot conclude that the government has met that burden. It is obvious why law enforcement might want to seize, and later search, a cell phone when investigating a crime. The Supreme Court has described the modern cell phone as "such pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude that they were an important feature of human anatomy." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014). As Detective Dorminy stated at the

25

hearing, cell phones contain a "wealth of information" that might assist law enforcement. [Doc. 49 at 146-47.] But, given how little Detective Dorminy knew about the circumstances of the shooting, he lacked probable cause to believe that the phone contained evidence of Pendergrass's shooting.

For starters, Detective Dorminy did not know to whom the phone belonged but reasoned that the phone could belong to a witness, a suspect, or the victim. [Doc. 49 at 146.]   Based on what Detective Dorminy knew, the phone also reasonably could have belonged to Pendergrass's mother (who owned the car) or a passenger who had ridden in the car earlier on the day of the shooting.  After all, the phone was found in the seat pocket facing the back seat; the driver or one of the passengers might be expected to keep the phone on his person, especially if he believed he was approaching a dangerous situation or might need to flee.  In any event, a search of the phone would be required to determine the identity of the phone's user and what connection, if any, the person had to the shooting, even assuming the phone contained any information relevant to the shooting at all.[8]   That

_____

[8] The government suggests that Detective Dorminy delayed obtaining a search warrant for the phone after seizing it because he might not have been successful in obtaining one, as he did not know to whom the phone belonged or whether there would be evidence of wrongdoing on the phone. [Doc. 62 at 27.] Although the probable cause standard is an objective one and does not depend on

26

does not satisfy the plain view doctrine's "immediately apparent" standard.  *See Dickerson*, 508 U.S. at 375; *United States v. Jaimez*, 15 F. Supp. 3d 1338, 1345 (N.D. Ga. 2013) (police unreasonably seized generic spiral-bound notebooks during a search for drugs and weapons because the incriminating nature of the notebooks was not apparent until officers flipped through the notebooks).  To the contrary, it is the sort of generalized rummaging for clues that the Fourth Amendment prohibits.  *See United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007) (explaining that the "immediately apparent" requirement of the plain view doctrine prevents general, exploratory rummaging).

Furthermore, the crime Detective Dorminy was investigating was a shooting, which is not a crime with which cell phones are intrinsically associated.  Cell phones are an instrument that may be used to accomplish certain crimes, like crimes perpetrated by criminal enterprises or drug distribution.  *See Jaimez*, 15 F. Supp. 3d at 1343 (seizure of cell phones was lawful during consent search of a home during a drug trafficking investigation, where multiple cell phones were found and the investigation involved wiretaps); *United States v. Rodriguez-Alejandro*, 664 F.

---

an officer's subjective beliefs, it is worth noting that the government has doubts about whether Detective Dorminy had probable cause to search the phone at the time he seized it.

Supp. 2d 1320, 1345 (N.D. Ga. 2009) (seizure of multiple cell phones was lawful where they were found in plain view during the execution of an arrest warrant in the course of a drug trafficking investigation involving wiretaps).  They are not, in most circumstances, intrinsically related to shootings or used as instruments in shootings.

A reasonable officer may well have suspected, based on the interviews with McCall and Anquaneice Jones and the strange circumstances of Pendergrass's arrival at the hospital, that he and his companions were engaged in criminal activity on the night of the shooting.  But, without more information about the shooting or Pendergrass and his companions' activities on the night of the shooting, that mere suspicion did not rise to the level of probable cause or otherwise suggest a connection between the cell phone and criminal activity.

In sum, there was not a sufficient nexus between the cell phone and the Pendergrass shooting or any other criminal activity Detective Dorminy may have suspected was afoot, and, thus, the warrantless seizure of the cell phone was not reasonable.  The Court therefore concludes that the evidence obtained from the cell phone should be suppressed.

28

### D.    The Search of the Wenham Lane Residence

Pendergrass moves to suppress all evidence seized from the Wenham Lane residence on March 30, 2017.  He challenges (1) the initial warrantless entry into the residence under the guise of a probation check; (2) the First Wenham Lane Warrant, which authorized the seizure of marijuana, digital scales, plastic bags, and ledgers in the residence[9]; and (3) the Second Wenham Lane Warrant authorizing the seizure of purported evidence of the robberies that officers observed during the execution of the initial warrant.[10]  The Court addresses each of these issues in turn.

### 1.    The Initial Entry into the Wenham Lane Residence

Pendergrass argues that probation officers and SA Winn violated the Fourth Amendment by entering the Wenham Lane residence without a warrant.  [Doc. 55 at 8-9.]  He contends that no one inside the residence gave consent for the officers to enter the house.  [*Id.* at 9.]  He also maintains that Officer Cabrera's assertion that he smelled marijuana is not credible.  [*Id.* at 9-10.]  The government responds that the officers' warrantless entry into the residence was lawful because they had

_____

[9] The First Wenham Lane warrant and supporting application was admitted as Government Exhibit 11 at the evidentiary hearing.  [*See* Doc. 48-5 at 1-7.]

[10] The Second Wenham Lane warrant and supporting application was admitted a Government Exhibit 12 at the evidentiary hearing.  [*See* Doc. 48-5 at 8-14.]

reasonable suspicion, or even probable cause, that Pendergrass, a probationer, was in violation of the terms of his probation or engaging in criminal activity or, alternatively, exigent circumstances justified their entry.  [Doc. 62 at 37.]

Considering the totality of the circumstances, the Court concludes that the officers' entry into the house was lawful because they had reasonable suspicion to believe that Pendergrass was in violation of his probation.[11]  Probationers are entitled to protection from unreasonable searches and seizures under the Fourth Amendment; however, their reasonable expectation is privacy is somewhat diminished.  *See Owens v. Kelley*, 681 F.2d 1362, 1367-68 (11th Cir. 1982).  The Eleventh Circuit has held that a warrantless search of a probationer's residence by probation officers is constitutionally permissible where it is based on a reasonable suspicion that the probationer is in violation of his probation conditions or engaged in criminal conduct.  *See United States v. Carter*, 566 F.3d 970, 975 (11th Cir. 2009); *see also United States v. Rile*y, 706 F. App'x 956, 960 (11th Cir. 2017) ("[P]robation officers are required to have reasonable suspicion of criminal conduct in order to search a probationer's residence when the terms of probation do not

---

[11] The government does not appear to argue that the officers obtained consent to enter the residence.  Accordingly, the Court does not address that issue further.

require him to submit to warrantless searches."), *cert. denied*, 138 S. Ct. 699 (2018); *United States v. Wasser*, 586 F. App'x 501, 505 (11th Cir. 2014) (concluding that, after probation officers lawfully entered a probationer's residence, they developed reasonable suspicion that probationer had violated the terms of his probation, justifying a search of the residence for additional violations); *United States v. Gomes*, 279 F. App'x 861, 869 (11th Cir. 2008) ("A probationer's house may be searched based upon reasonable suspicion."); *United States v. Denton*, No. 1:11-CR-00546-AT-RGV, 2012 WL 3871929, at *7 (N.D. Ga. June 19, 2012), *report and recommendation adopted*, 2012 WL 3871927 (N.D. Ga. Sept. 5, 2012). Reasonable suspicion consists of a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005). To determine whether the officer has a particularized and objective basis for suspected legal wrongdoing, the court must examine the totality of the circumstances and "take stock of everything [officers] knew before searching." *Id.*

At the time of the entry, Pendergrass was subject to probation conditions that included, among other things, that he refrain from criminal conduct, that he refrain from the use of narcotics and other dangerous drugs, that he permit his probation

31

officer to visit him in his home and elsewhere, and that he not change his place of residence without permission of his supervising officer.  (Gov't Ex. 15 [Doc. 48-5 at 24-25].)   Taking stock of everything the officers knew prior to entering the residence, the Court concludes that the officers lawfully entered the Wenham Lane residence based on the reasonable suspicion that Pendergrass was in violation of the conditions of his probation.   SA Winn had informed the Department of Community Supervision that Pendergrass was a suspect in several robberies and that it appeared that, based on the Anquaneice Jones interview and SA Winn's physical surveillance, Pendergrass was not residing at the address he had reported to probation.  [Doc. 49 at 52-53.]  Thus, even before officers arrived at the Wenham Lane residence, the officers were aware of facts indicating that Plaintiff had changed his residence without authorization.  Then, on the morning of March 30, 2017, Officer Cabrera and SA Winn smelled the odor of marijuana when the door to the house was opened, giving officers additional reasonable suspicion to believe that Pendergrass may have been using marijuana in violation of the conditions of his probation.

Pendergrass does not make any argument to challenge the officers' belief that he had changed his residence without permission.  Instead, he contends that

32

the officers' testimony that they smelled marijuana is not credible. [Doc. 55 at 9-10.] Specifically, he argues that although Officer Cabrera and SA Winn claimed that they detected the odor of marijuana, Anquaneice Jones who was present at the time of the officers' entry, denied that the house smelled of marijuana or that anyone inside the house was smoking marijuana. [*Id.* at 9 (citing Doc. 49 at 167).] He further points out that Officer Cabrera also testified that he did not see any one smoking marijuana in the house and did not observe any marijuana in the basement or upstairs areas of the house. [*Id.* at 9-10 (citing Doc. 49 at 139).] Finally, he cites the inventory for the search, which reveals that only marijuana stems and a green leafy material were seized, but does not indicate the quantity of marijuana seized. [*Id.* at 10 (citing Doc. 55-1 at 1).]

The Court credits the testimony of Officer Cabrera and SA Winn that they smelled the strong odor of marijuana when the door to the house was opened. Pendergrass points to no evidence that would cause the Court to believe that both officers would lie about smelling marijuana. Though Anquaneice Jones and Alicia Jones denied smelling or seeing anyone smoking marijuana that morning, it is still reasonable to conclude that the officers smelled marijuana that morning. Alicia Jones testified that one of her sons who lived at the house smoked marijuana, and

officers observed evidence of marijuana use in the garage.  Though Alicia Jones testified that her son was sleeping at the time, she had left for work around 7:30 that morning and had not been present at the residence for nearly two hours prior to the officers' entry.  [Doc. 49 at 171-72.]  To Pendergrass's point that no specific quantity of green leafy material or marijuana is listed on the inventory, that fact does not mean that officers did not detect the smell of marijuana, especially since other evidence of marijuana use—including roaches, tobacco from the making of a blunt, and marijuana stems—was observed or seized by law enforcement.  [Doc. 49 at 95-97; Doc. 55-1.]

In sum, at the outset of the encounter, the officers had reasonable suspicion to believe that Pendergrass had violated the terms of his probation by failing to reside at the address he had reported to probation.  That reasonable suspicion was bolstered when the woman who answered the door indicated that Pendergrass was within the house.  [Doc. 49 at 56.]  Moreover, under the totality of the circumstances, when the officers smelled the strong odor of marijuana, they also reasonably suspected that Pendergrass was engaged in further criminal activity. Thus, the officers' warrantless entry into the residence and initial search or sweep of the residence was supported by reasonable suspicion and was therefore lawful.

34

2.     **The First Wenham Lane Warrant for Marijuana and Related Paraphernalia**

Pendergrass next argues that there was no probable cause for the issuance of the First Wenham Lane Warrant for marijuana and related items because there is no evidence that anyone was smoking marijuana in the house. [Doc. 55 at 9-10.] This argument misstates the applicable standard. All the Fourth Amendment required, with respect to Pendergrass, was that the officers have reasonable suspicion to believe he was violating the terms of his probation or engaging in criminal activity. As discussed above, the officers had the requisite reasonable suspicion and therefore were authorized in entering and searching the residence. This argument also turns entirely on the credibility of Officer Cabrera's and SA Winn's testimony, which the Court credits.

Pendergrass also argues that the items in the house were not in plain view, and in any event, the officers were not lawfully in the house where any objects could be plainly viewed. [Doc. 55 at 10-11.] Again, as just discussed above, officers could lawfully enter and search the house because they had reasonable suspicion that Pendergrass had violated one or more conditions of his probation and was engaged in further criminal activity. In addition, the first warrant application was not based physical evidence that persons within the house were

35

using marijuana.  Rather, it was based on the officers' detection of the odor of marijuana, among other circumstances described in the affidavit, namely, the rapid movements of persons within the house when the probation officers arrived and Pendergrass's belligerence when he saw his probation officer, notwithstanding the terms of his probation requiring him to allow his probation officer to visit.  (Gov't Ex. 11 [Doc. 48-5 at 1-4]; Gov't Ex. 15 [Doc. 48-5 24-25].)  Considering the totality of the circumstances, the Court concludes that the First Wenham Lane warrant was supported by probable cause to believe that persons within the house were using marijuana.  *See Gates*, 462 U.S. at 238; *Brown*, 460 U.S. at 742.

### 3.      The Second Wenham Lane Warrant

Pendergrass challenges the Second Wenham Lane warrant on the grounds that (1) the items discovered during the execution of the first search warrant were outside the scope of the first warrant and could not provide a basis for obtaining the second search warrant and (2) even if it was proper to include those items in the search warrant application, no probable cause existed to support the warrant. [Doc. 37 at 2-3.]  The Court rejects these arguments.  First, the testimony of SA Winn and Officer Cabrera demonstrates that, during the execution of the first search warrant, SA Winn observed a shirt depicted in the robberies, the backpack, ammunition, the rifle scope, the police scanner, and the ballistic vest.  [Doc. 49 at

58-59.]  The shirt was on top of a hamper in Pendergrass's bedroom; the backpack was in the corner of the room; the police scanner and scope was on a counter; the ammunition was on top of a refrigerator.  [*Id.* at 63-64, 110, 112-13.]  It is unclear where the ballistic vest was located, but there is no indication that it was located in an area where law enforcement would not be authorized to search pursuant to the First Wenham Lane warrant.  [*Id.* at 112.]  Pendergrass seems to argue that law enforcement could not rely on evidence that they observed while executing the First Wenham Lane Warrant to support the application for the second warrant; however, that argument is without merit.  There is, of course, no absolute bar on law enforcement using information that they observe during the execution of a warrant to apply for a second search warrant.

Pendergrass's argument that probable cause was lacking to support the second warrant is completely undeveloped.  He does not explain in what way the affidavit in support of the warrant was purportedly defective; rather, his argument is simply one of assertion.  Nonetheless, applying the standard of review set out in *Gates* and *Davis*, the Court readily concludes that the affidavit supporting the application of the second search warrant is supported by probable cause.  (*See* Gov't Ex. 12.)  Specifically, in the section of the search warrant describing the basis

37

for probable cause, the officer applying for the warrant, Detective J.D. Bentley with the Gwinnett County Police Department provided a summary of: (1) his training and experience; (2) his investigation into the armed robberies of Polo's Taqueria, China Star, Discount Grocery, Bonita Coin Laundry, and Best Wings restaurant, including, among other things, detailed descriptions of the robbers' clothing and firearms as depicted on surveillance video; (3) SA Winn's investigation linking Pendergrass to the robberies; and (4) what officers located during the execution of the First Wenham Lane Warrant. (*Id.*) The Court finds these facts are sufficient to establish probable cause to believe that evidence related to the offenses of armed robbery and aggravated assault with a deadly weapon were located in the Wenham Lane residence.

Accordingly, Pendergrass's motion to suppress the evidence seized in connection with the Second Wenham Lane Warrant should be denied.

### E.     The Second Search of the Porsche Cayenne on March 30, 2017

Pendergrass also moves to suppress all evidence seized from the Porsche Cayenne on March 30, 2017, pursuant to the second search warrant for the vehicle. [Doc. 37 at 4; Doc. 55 at 11.] The basis for suppression is unclear. In his initial brief, Pendergrass contends, without elaboration, that the affidavit supporting the warrant failed to establish a nexus between criminal activity and firearms that SA

38

Winn observed in the vehicle.  [Doc. 37 at 4.]  In his post-hearing brief, he argues, again without elaboration, that just as items in the residence were not in plain view, "any search of the car on March 30 . . . was completely unjustifiable and therefore all items found therein should be suppressed."  [Doc. 55 at 11.]

The Court concludes that the March 30, 2017 warrant to search the Porsche Cayenne was supported by probable cause.  On March 30, Detective Dorminy prepared an affidavit in support of the search warrant for the Cayenne, in which he (1) related that agents had executed a search warrant at the Wenham Lane residence in connection with the investigation of the armed robberies charged in this case; (2) summarized the investigation into the armed robberies, including that the robbers used multiple handguns and an AR-15-style assault rifle in the robberies; (3) summarized his involvement with the investigation into Pendergrass's March 10 shooting and Pendergrass's connection with the vehicle; (4) stated that the same vehicle was located on the street in front of the residence that had just been searched; and (5) described that SA Winn observed in plain view "a black handle of a handgun protruding from the front passenger side door" and "a hard case for a long gun in the rear cargo area" of the vehicle.  (Gov't Ex. 13.)

39

Though the warrant affidavit could have been more explicit in its explanation concerning why Pendergrass was a suspect in the armed robberies, the Court concludes that Detective Dorminy's affidavit was sufficient to provide a nexus between the vehicle and the armed robberies and between the vehicle and Pendergrass. The affidavit explained that the suspects used handguns and an AR-15-style assault rifle during the armed robberies. SA Winn's observation that a handgun was in the front passenger side door and that there was a case for a long gun in the rear cargo area is consistent with the types of firearms used in the robberies. Detective Dorminy also stated that, based on his investigation into the March 10, 2017 shooting, he was aware that Pendergrass drove the car on a regular basis. The Porsche Cayenne was registered to Pendergrass's mother, but Detective Dorminy knew that she resided in Macon, Georgia. Accordingly, the affidavit established probable cause for the search of the car, and there is no basis for suppressing the evidence seized during that search.

### F.    The Tower Dump

Pendergrass additionally moves to suppress tower dump information that SA Winn obtained during the course of the FBI's investigation. Relying on *Carpenter v. United States*, 138 S. Ct. 2206 (2018), Pendergrass argues that although the Supreme Court did not explicitly answer the question of whether the government

must obtain a warrant to obtain phone records by way of a tower dump, the reasoning of *Carpenter* necessarily extends to tower dump information because individuals have a reasonable expectation of privacy in the information shared by their phones.  [Doc. 37 at 2; Doc. 72.]  The government responds that the good faith exception to the exclusionary rule applies to the tower dump at issue in this case because, at the time SA Winn obtained the court order authorizing the tower dump, it was lawful under both the Stored Communications Act, 18 U.S.C. § 2701 *et seq.* and existing Eleventh Circuit authority holding that a search warrant was not required to obtain historical cell site data.  [Doc. 73 at 3-6.]  In the alternative, the government argues that the Supreme Court held in *Carpenter* that its holding did not apply to tower dumps.  [*Id.* at 6-7.]  Pendergrass has filed a reply.  [Doc. 79.]

The Court agrees with the government that, assuming solely for the sake of argument that *Carpenter* applies to tower dumps, the good faith exception to the exclusionary rule applies.[12]  Though *Carpenter* is controlling going forward, it can have no effect on Pendergrass's case here because the exclusionary rule's "sole

---

[12] The Court observes that the Supreme Court stated it was not "express[ing] a view on matters not before [the Court]," including tower dumps.  *Carpenter*, 138 S. Ct. at 2220.  Because the good faith exception applies here, the Court similarly need not (and does not) consider whether the reasoning of *Carpenter* applies to tower dumps.

41

purpose . . . is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236-37 (2011) (citing *United States v. Leon*, 468 U.S. 897, 909, 921 n.22 (1984)).   Indeed, the Eleventh Circuit has recently applied the exclusionary rule to hold that historical cell site records that the government obtained using an order obtained pursuant to the Stored Communications Act pre-*Carpenter* were not subject to suppression. *See United States v. Joyner*, --- F.3d ---, 2018 WL 3853443, at *3 (11th Cir. Aug. 14, 2018); *see also United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018) (holding that good-faith exception to exclusionary applied to government's seizure of cell phone records pursuant to court order under the Stored Communications Act and related Virginia state law), *petition for cert. filed*, Aug. 8, 2018; Order, *United States v. Mario Jackson and Brandon Redmond*, No. 1:15-cr-284-AT-JKL (N.D. Ga. July 12, 2018), Doc. 382 at 8 n.3 (citing *Chavez* and reasoning that that *Carpenter* had "no effect" on the government's warrantless seizure of cell tower location information obtained prior to the issuance of *Carpenter*).

Here, SA Winn obtained a court order for the tower dumps on January 30, 2017, pursuant to the Stored Communications Act, nearly seventeen months before *Carpenter* came down.  [Doc. 73-1 (Order for Cell Tower Records); Doc. 73-2

(Application for Cell Tower Records).]  At that time, the law in this Circuit was that communications records obtained under the Stored Communications Act could be obtained by a court order without the need of a search warrant.  *See United States v. Davi*s, 785 F.3d 498, 511 (11th Cir. 2015) (*en banc*) (holding that "the government's obtaining a § 2703(d) court order for the production of [defendant's telephone company's] business records did not violate the Fourth Amendment").  Accordingly, the Court readily concludes that the good-faith exception to the exclusionary rule applies and that Pendergrass's motion to suppress evidence obtained from the tower dumps should be denied.

### G.    Summary

For the foregoing reasons, the first search of the Porsche Cayenne on March 10, 2017; the search and seizure of the LG cell phone recovered from the vehicle, and the March 30, 2017 searches of the Wenham Lane residence and Porsche Cayenne did not violate Pendergrass's rights under the Fourth Amendment.  The government has not shown, however, that the warrantless seizure of the LG cell phone during the March 10, 2017 search of the Porsche Cayenne was lawful.  In addition, the good-faith exception to the exclusionary rule applies to the government's obtaining cell tower records pursuant to a court order.  Accordingly, it is **RECOMMENDED** that Pendergrass's Omnibus Motion to Suppress

43

Evidence [Doc. 37] and his Amended Motion to Suppress [Doc. 41] be **GRANTED**

**IN PART**, only as to the LG cell phone seized from the Porsche Cayenne during

the March 10, 2017 search, and **DENIED IN PART**, in all other respects.

### III.   Thomas's Motion to Suppress Evidence [34]

Thomas moves to suppress seized pursuant to search warrants for evidence

from Thomas's prior residence on Cannonball Court, his Facebook account, and

his cell phone. [Doc. 34.] Thomas first argues that none of the three search warrant

affidavits supports a finding of probable cause. [*Id.* at 8-10.] Next, he argues that

the search of the Cannonball Court residence was unreasonable because the pants

that agents seized did not match the clothing described in the warrant. [*Id.* at 11-

12.] Third, Thomas argues that the warrant authorizing the search and seizure of

information from his Facebook account was overbroad under the Eleventh Circuit's

decision in *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017). [*Id.* at 12-13.]

The government opposes the motion. [Doc. 62 at 51-55.] Specifically, the

government argues that the warrants were supported by facts indicating that

Thomas was involved in Hobbs Act robberies and that evidence of those robberies

would be located at his residence, on his cell phone, and on his Facebook account.

[*Id.* at 51-54.] The government also alleges that even though the pants that were

seized from Thomas's residence were not described in the warrant, the seizure was

constitutional because the pants were in plain view and could therefore properly be seized as evidence.  [*Id.* at 54-55.]  Finally, as to the Facebook warrant, the government contends that the good faith exception to the exclusionary rule applies. [*Id.* at 52.]

### A.    Summary of Affidavits

The search warrant applications were each supported by an affidavit from SA Winn.  Because Thomas challenges the sufficiency of each of the affidavits supporting those search warrants, the Court summarizes the pertinent portions.

In SA Winn's affidavit in support of the warrant to search the Cannonball Court residence summarized his training and experience as an FBI special agent and law enforcement officer.  (Gov't Ex. 6, Aff. ¶¶ 1-2.)  He stated that he knows that persons involved with illegal activity, such as commercial robberies, conceal and keep in their residences currency and other proceeds from the illegal criminal activities.  (*Id.* ¶ 3.)  He further stated that it is common for them to keep firearms, clothing, and other accoutrements utilized in the criminal activity in their residences, as well as cell phones and other computer devices to perform research. (*Id.*)

To demonstrate probable cause for the warrant, SA Winn stated that the FBI was investigating a series of eight armed commercial robberies that occurred

between August 2016 and January 2017 in the Northern District of Georgia, the Middle District of Georgia, and the Eastern District of Tennessee.  (Gov't Ex. 6, Aff. ¶ 7.)  Police apprehended Rarreckus Delbridge, one of the robbers allegedly involved in an August 2016 robbery in the Middle District of Georgia, after he attempted to flee.  (*Id.* ¶ 8.)  Delbridge identified Pendergrass to law enforcement as the other person who committed the armed robbery with him.  (*Id.*)  SA Winn then explained that based on the analysis of cell tower data, Pendergrass was identified as a suspect in three other armed robberies because his cell phone was located in the vicinity of those robberies at the time of the robberies.  (*Id.* ¶ 9.)

SA Winn then wrote that on March 30, 2017, law enforcement executed search warrants at Pendergrass's residence in Lawrenceville and his vehicle, the gold Porsche Cayenne.  (Gov't Ex. 6, Aff. ¶ 10.)  Officers seized evidence linking Pendergrass to the robberies, including a distinct shirt that matched the shirt worn by one of the robbers during two of the robberies and an assault rifle that matched the firearm carried by one of the robbers during one of the robberies.  Pendergrass was arrested, and during a post-arrest interview in which he waived his *Miranda* rights, Pendergrass admitted that the rifle and shirt were his.  (*Id.*)

46

SA Winn then summarized a recorded jail call between Delbridge and an unidentified person he referred to as an "associate" of Delbridge and Pendergrass. (Gov't Ex. 6, Aff. ¶ 11.)  He related that in late April 2017 Delbridge called the associate from jail, and the associate told Delbridge that Pendergrass had been arrested and was being investigated by the FBI.  The associate stated that Pendergrass was "hot," which SA Winn understood to mean, based on his training and experience, that Pendergrass had been committing criminal acts.  The associate also stated that "'Face' had been doing 'a lot of missions'" with Pendergrass, which SA Winn took to mean that Pendergrass and "Face" had been committing criminal acts together.  Later in the call, the associate identified "Face" as Thomas.  (*Id.*)

SA Winn next summarized the May 25, 2017, interview with Anquaneice Jones, Pendergrass's girlfriend.  (Gov't Ex. 6, Aff. ¶ 12.)  He stated that agents showed a picture of Thomas to Anquaneice Jones, and that she recognized the person in the photograph as "Face."  She also informed the FBI that Thomas was Pendergrass's friend and that Thomas was with Pendergrass on March 10, 2017, when Pendergrass was shot.  (*Id.*)

SA Winn then summarized the June 12, 2017 interview with a "former neighbor" of Thomas (presumably, McCall).  (Gov't Ex. 6, Aff. ¶ 13.)  SA Winn

wrote that the "neighbor" identified "Face" as Thomas and that the neighbor recognized Thomas as one the robbers in surveillance video of the December 24, 2016 robbery at Polo's Taqueria in Lawrenceville, Georgia, and the January 1, 2017 robbery at Discount Grocery in Tucker, Georgia.  SA Winn noted that the neighbor recognized Thomas based on his physical characteristics, his mannerisms, and the shoes that he was wearing.  The neighbor advised that Thomas lived with his mother at the Cannonball Court residence and that she had observed Thomas at that address as recently as June 12, 2017.  (*Id.*)  SA Winn wrote that according to the Georgia Department of Drivers Services ("DDS"), Thomas's address was listed as the Cannonball Court residence's address, the same address that the neighbor provided.  (*Id.* ¶ 15.)  DDS records also listed Thomas's height as 5'08" and 150 pounds, which appeared to be consistent with the physical characteristics of the robber that the neighbor identified.  (*Id.*)

SA Winn next explained that the surveillance videos from the December 24, 2016 and January 1, 2017 robberies revealed that the robber who was identified as Thomas carried what appeared to the same gun in both robberies, namely, a semi-automatic handgun with a silver slide and black receiver.  (Gov't Ex. 6, Aff. ¶ 14.)  As of the date of the affidavit, Thomas was on felony probation with the Georgia

48

Department of Community Supervision for aggravated assault, and an active arrest warrant for a probation violation with nationwide extradition had been issued on May 20, 2016.  (*Id.* ¶ 16.)

Judge Vineyard signed the warrant, which authorized the seizure of all evidence relating to violations of 18 U.S.C. §§ 1951 and 924(c), including clothing and accoutrements worn by an individual depicted in still images of the December 24, 2016 and January 1, 2017 robberies.  (Gov't Ex. 6 (search warrant).)

SA Winn's affidavits in support of the applications for the Facebook and the cell phone warrants repeat much of what was set out in the affidavit supporting the warrant to search the residence.  In terms of probable cause, SA Winn repeated that: the FBI was investigating a series of nine armed commercial robberies that occurred in Georgia and Tennessee; that Delbridge identified Pendergrass as the other person who committed the August 2016 robbery; that law enforcement seized Pendergrass's shirt a firearm purportedly used during one of the robberies; that Delbridge was heard on a jail call speaking with an associate who stated that Pendergrass and "Face" were committing crimes together; that Anquaneice Jones identified Thomas as "Face" in an FBI interview; that Thomas's "former neighbor" also identified Thomas as "Face" and identified him in surveillance video of the

49

December 24, 2016 and January 1, 2017  robberies; and that surveillance video of the two robberies showed the robber with what appeared to be the same firearm in both robberies.  (Gov't Ex. 7, Aff. ¶¶ 5-12; Gov't Ex. 8, Aff. ¶¶ 7-14.)

In both affidavits supporting the applications for the Facebook and cell phone warrants, SA Winn also wrote that on June 14, 2017, Judge Vineyard issued a search warrant for Thomas's residence, and that on June 23, FBI agents executed the warrant and discovered clothing that matched the clothing worn by the robber believed to be Thomas in the December 24, 2016 and January 1, 2017 robberies. (Gov't Ex. 7, Aff. ¶¶ 13-14; Gov't Ex. 8, Aff. ¶¶ 15-16.)  Agents also located 12-gague shotgun shells and .38 caliber ammunition at the residence.  (Gov't Ex. 7, Aff. ¶ 14; Gov't Ex. 8, Aff. ¶ 16.)  A .38 caliber firearm was fired during one of the robberies.  (Gov't Ex. 7, Aff. ¶ 14; Gov't Ex. 8, Aff. ¶ 16.)  Thomas is a convicted felon.  (Gov't Ex. 7, Aff. ¶ 14 ; Gov't Ex. 8, Aff. ¶ 16.)

In the affidavit supporting the application for the Facebook warrant, SA Winn wrote that the former neighbor (presumably McCall) advised that Thomas did not have a cell phone account and that he used his Facebook account to communicate with others.  (Gov't Ex. 7, Aff. ¶ 15.)  The former neighbor last communicated with Thomas via Facebook on June 22, 2017.  Based on this

information, SA Winn wrote that he believed that Thomas likely communicated with Pendergrass and other coconspirators via Facebook to discuss the planning, execution, and concealment of their alleged criminal activities.  (*Id.*)  As of June 30, 2017, Thomas's Facebook account remained active.  (*Id.* ¶ 16.)  The balance of SA Winn's probable cause section discusses his knowledge concerning how Facebook operates and stores data, and why Facebook's computers likely contained evidence relevant to the case.  (*Id.* ¶¶ 17-36.)

In the affidavit supporting the application for the cell phone warrant, SA Winn wrote that agents located the LG cell phone charging in Thomas's bedroom.  (Gov't Ex. 8, Aff. ¶ 17.)  SA Winn also wrote that the former neighbor advised the Thomas does not have a cell phone account an instead uses Wi-Fi to communicate with others using his phone, and, thus, likely used the device to communicate with Pendergrass and other co-conspirators to discuss the planning, execution, and concealment of criminal activity.  (*Id.* ¶ 18.)

## B.    Discussion

Thomas makes three main arguments as to why each of the affidavits fails to establish probable cause.  First, he argues that the affidavits supporting the search warrant applications for the residence, his Facebook account, and his cell phone failed to establish probable cause.  [Doc. 34 at 8-10; Doc. 54 at 12-13.]  Second,

Thomas challenges the reasonableness of the search of his residence, arguing that officers exceeded the scope of the warrant by seizing black pants with white stripes running down the leg that were not specifically identified on the face of the warrant. [Doc. 34 at 11-12; Doc. 54 at 14.]  Third, Thomas argues that the Facebook warrant was not sufficiently particularized.  [Doc. 34. at 12-13.]  The Court discusses each argument in turn.

### 1.    Probable Cause Supports Each of the Warrants

Thomas advances several arguments as to why SA Winn's affidavits supporting the search warrants were insufficient.  First, he argues that each affidavit indicates that an "associate" of Delbridge identified Thomas as a person who had been doing missions with Pendergrass, but the affidavits do not provide information to verify the reliability or basis of knowledge of the "associate."  [Doc. 34 at 8-9.]  The Supreme Court has recognized that when an affidavit is based in substantial part on information provided by an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause.  *Gates*, 462 U.S. at 230.  Here, the "associate" cannot fairly be described as an informant.  To the contrary, SA Winn states in each of the affidavits that the "associate" was intercepted on a jail call with

Delbridge reporting information concerning Pendergrass and Thomas's alleged criminal activities to Delbridge.

Second, Thomas argues that the affidavits rely Anquaneice Jones's and McCall's identifications of him, which are unreliable for the reasons set out in his motion to suppress the identifications. [Doc. 34 at 9; *see also* Doc. 35.] As will be discussed in Part IV below, the Court finds that the identifications were sufficiently reliable.

Third, Thomas argues that the affidavits fail to establish the reliability or basis of knowledge of McCall (identified only as a "former neighbor") in the affidavit. [Doc. 34 at 9-10.] This argument is not persuasive. The affidavits state that McCall identified "Face" as Thomas and provide detail concerning McCall's review of surveillance videos from several of the robberies and her reasons for believing that she recognized him in the videos. (Gov't Ex. 6, Aff. ¶ 13; Gov't Ex. 7, Aff. ¶ 11; Gov't Ex. 8, Aff. ¶ 13.) She also provided Thomas's address and told law enforcement that she had last seen him at that address that day, June 12, 2017. (Gov't Ex. 6, Aff. ¶ 13.) Law enforcement corroborated the address and the physical description that McCall provided using the Georgia DDS. (*Id.* ¶ 15.) Moreover, the officers were able to speak to McCall face-to-face, which can

53

enhance credibility.  *See United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004) ("A face-to-face anonymous tip is presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant.").

Fourth, Thomas argues that the warrants for the cell phone and Thomas's Facebook account failed to establish probable cause that evidence of a crime would be found on either the phone or his Facebook account.  [Doc. 34 at 10.]  He argues that the affidavits simply state that Thomas uses a cell phone and Facebook to communicate with others, but there is no information suggesting that he was using either the phone or Facebook in connection with the armed robberies that law enforcement was investigating.  [*Id.*]

The Court disagrees.  SA Winn's affidavit in support of the Facebook warrant explicitly states that McCall reported that Thomas used his Facebook account to communicate with people and that she last communicated with him via Facebook on June 22, 2017, approximately two weeks before SA Winn applied for the warrant.  (Gov't Ex. 7, Aff. ¶ 15.)  SA Winn also stated that based on that information he believed that Thomas likely communicated with Pendergrass and

other co-conspirators using Facebook "to discuss the planning, execution, and concealment of their crimes." (*Id.*)  The basis for this assertion appears to be his both his knowledge of the way that Facebook operates and his conclusion that, in order to pull off the robberies under investigation, Thomas must have used Facebook to communicate with Pendergrass.  Thus, as a matter of common sense, it stands to reason that Thomas's Facebook account would contain evidence highly relevant to the robberies.

The same rationale applies to the affidavit for the cell phone warrant. According to SA Winn's affidavit, the cell phone was seized from Thomas's bedroom at the Cannonball residence when agents executed the search warrant for the residence.  (Gov't Ex. 8, Aff. ¶ 17.)  SA Winn also stated that McCall advised that Thomas used a cellular phone to communicate with people using Wi-Fi; thus, SA Winn believed that Thomas likely used the cell phone to communicate with Pendergrass and other co-conspirators "to discuss the planning, execution, and concealment of their crimes." (*Id.* ¶ 18.)  Given these circumstances, it was likely that evidence of Thomas's communications with Pendergrass (and others) would be contained on Thomas's cell phone. *See United States v. Kendricks,* No. 1:15-CR-400-MHC-AJB, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016) (finding

55

warrant affidavit established nexus between cell phone and alleged gang activity), (citing *Riley v. California* for the proposition that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals"), *aff'd*, 723 F. App'x 950 (11th Cir. 2018). Accordingly, the Court finds that the Facebook and cell phone warrants were supported by an adequate nexus with the crimes under investigation.

Finally, Thomas argues that SA Winn's affidavits were not accurate. [Doc. 54 at 13.] Thomas points out that the evidentiary hearing, SA Winn testified that, when he interviewed McCall in June 2017, he did not know who Face was. [Doc. 49 at 30-31, 67-68.] However, in each of the search warrant affidavits, SA Winn stated that an unidentified associate identified "Face" as Thomas in a jail call recorded in late April 2017. According to Thomas, SA Winn was either untruthful in his warrant affidavit or untruthful at the evidentiary hearing. [Doc. 54 at 13.] Thomas also contends that SA Winn's statement in his affidavits that "Agents showed a picture of Shawn THOMAS to JONES, and she recognized the person in the picture as 'FACE'" is false, as it was SA Winn—not Anquaneice Jones—who suggested that Thomas was Face. Thomas maintains that once those "false

56

assertions are omitted from the affidavits supporting the search warrants, it is clear that there was insufficient probable cause to connect Mr. Thomas to the robberies and to justify the search of his prior residence, cell phone, and Facebook account." [*Id*; *see also* Doc. 64 at 3.]

Those arguments are not persuasive. Starting with the jail call, even though the call was recorded in April 2017, the affidavit is silent as to when SA Winn listened to the call. Thus, Thomas's apparent assumption that SA Winn knew that Thomas was Face in April 2017 is not necessarily true. In any event, the facts demonstrate that in May and June 2017 SA Winn was attempting to link Thomas and Face, and it stands to reason that it was not until SA Winn interviewed McCall, who knew Thomas personally, that he knew with confidence that "Face" was Thomas.

Nor was it inaccurate for SA Winn to write that Anquaneice Jones recognized the person in the photograph of Thomas as "Face." During the May 2017 interview with Anquaneice Jones, SA Winn asked her if she knew of someone named "Face," and, in response, she asked if SA Winn if he was referring to "Little." [Doc. 49 at 36-37]; (Gov't Ex. 5 at 3:45-50.) SA Winn responded, "I know him by 'Face' but . . . you know him by Little?" and asked her "Is he the same guy?"

57

(Gov't Ex. 5 at 3:45-3:52.)  She responded she was "pretty sure" they were the same person.  (*Id.* at 3:52-53.)  She went on to describe the physical characteristics of the person whom she referred to as "Little" and ultimately identified a photograph of Thomas as Little.  (*Id.* at 3:52-4:10, 4:45-5:30, 5:54-56.)  Viewing this interview in its entirety, SA Winn's statement that Anquaneice Jones recognized the person as "Face" is not false.  She made the link between Face and Little, and it is clear that SA Winn understood that Face and Little were the same person.  So even though Anquaneice Jones stated that the person in the photograph was "Little," it is obvious that "Little" and "Face" were the same person.

### 2.    Seizure of the Black Pants with White Stripes

Thomas argues that a pair of black pants with white stripes running down the legs seized during the search of his residence should be suppressed because the pants were not specifically listed in the search warrant for the residence.  [Doc. 34 at 11-12; Doc. 54 at 14.]  Thomas additionally argues that that the unlawful seizure of the pants was so flagrant that all items seized during the execution of the warrant should be suppressed.  [Doc. 34 at 11-12.]  In response, the government concedes that the black pants were not specifically listed in the warrant but contends that their seizure was nonetheless lawful under the plain view doctrine.  [Doc. 62 at 54-

55.]  In reply, Thomas argues that the plain view doctrine does not apply because the pants were not evidence of the robberies.  [Doc. 64 at 3.]

Applying the "plain view" doctrine articulated *supra*, the Court first finds that there is no dispute that SA Winn was lawfully present in the Cannonball Court residence at the time of the seizure of the pants, as he had obtained a valid warrant authorizing a search of the residence for evidence relating to the robberies under investigation.  The question is, therefore, whether it was immediately apparent the pants were evidence of a crime.  According to the government, during the execution of the warrant, SA Winn recognized that the pants Thomas was wearing were similar to pants worn by one of the robbers in video of the December 24, 2016 robbery of Polo's Taqueria.  [Doc. 62 at 55.]  The government maintains that although SA Winn was not completely sure that the robber wearing the pants during that robbery was Thomas, the evidentiary value of the pants was immediately apparent because the pants were similar to those worn by one of the robbers and he knew that robbers often share clothes for conducting robberies.  [*Id.*]

Thomas responds that the seized pants do not match those worn by any of the robbers; thus, it would not have been immediately apparent to SA Winn that the pants were worn during the commission of the robberies.  [Doc. 64 at 3.]  He

also argues that if SA Winn understood robbers to frequently share clothing used in robberies, then SA Winn should not have limited the warrant application to the articles of clothing worn by the robber whom he believed to be Thomas. [*Id.* at 3-4.]

The Court has reviewed the photographs entered in to evidence at the hearing and notes that the pants that were seized from Thomas's person during the search do not appear to match those worn by one of the robbers in the surveillance video of the Polo's Taqueria robbery. The surveillance video for the Polo's Taqueria depict one the robbers wearing a pair of black pants with three white stripes running down the leg, whereas the striped pants that agents seized from Thomas appear to have two white stripes running down the leg. Though neither photograph is crystal clear, a side-by-side comparison shows that the pants do not appear to be identical:

 

(*See* Gov't Ex. 9 [Doc. 48-4 at 3];  Gov't Ex. 10 [Doc. 48-4 at 5].)  Indeed, SA Winn did not recall how many stripes the pants that he seized had, and he acknowledged that the photograph of the pants seized from Thomas.  [Doc. 49 at 72.]  Accordingly, the Court agrees with Thomas that the pants that were seized from his person during the search are not the same ones depicted in the video of the Polo's Taqueria.

But in order for an item's incriminating nature to be "immediately apparent" to law enforcement, it is not necessary that the officer know that the item is, in fact, evidence of a crime; rather, inquiry is whether "'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband.'"  *United States v. Folk*, 754 F.3d 905, 912 (11th Cir. 2014) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).  Here, although the pants are not identical, they unquestionably bear a strong resemblance to those worn by one of the robbers depicted in surveillance of the Polo's Taqueria.  Both pants are black athletic-style pants and have stripes down the leg.  Moreover, the circumstances of the seizure suggest that SA Winn had probable cause to believe that the pants were used in the robberies.  When SA Winn encountered Thomas, Thomas was wearing

61

the two-striped pants.[13]  [Doc. 49 at 71.]  SA Winn suspected that Thomas was one

of the robbers seen in surveillance footage, and he was aware that that robbers often

share clothes used in committing robberies.  [*Id.* at 44-45, 107.]  Because the pants

seized from Thomas closely resembled those worn by one of the robbers, it was

reasonable for SA Winn to conclude that the pants were evidence of the robberies.

Thomas's argument that SA Winn could have drafted the warrant to include

clothing that any robber wore is of no moment.  He cites no authority to suggest

that the plain view doctrine is limited to situations where law enforcement could

not have possibly drafted a more inclusive warrant.  Similarly, because the Court

finds that the seizure of the pair of pants was lawful, the Court rejects Thomas's

argument that all evidence seized pursuant to the search warrant should be

suppressed.

### 3.      Alleged Overbreadth of Facebook Warrant

Thomas argues, based on dicta in *United States v. Blake*, 868 F.3d 960 (11th

Cir. 2017), that the warrant authorizing the collection and seizure of data associated

with his Facebook account was constitutionally defective because it was not

---

[13] SA Winn initially testified that he found the pants in Thomas's bedroom
but later clarified that Thomas was wearing the pants.  [Doc. 49 at 43, 71.]

sufficiently particularized.  [Doc. 34 at 12-13.]  He further maintains that the good faith exception is inapplicable because the affidavit supporting the warrant does not establish probable cause.  [*Id.*]

When executing a search and seizure warrant, law enforcement officers must comply with all four of the requirements of the Fourth Amendment:  "(1) [the warrant] must be based on probable cause, (2) the probable cause must be supported by sworn testimony or an affidavit, (3) the place to be searched must be described with particularity, and (4) the evidence to be seized must be particularly described." *United States v. Brown*, 596 F. Supp. 2d 611, 624 (E.D.N.Y. 2009) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)).  The exclusionary rule, in turn, forbids the use of evidence obtained in violation of the requirements of the Fourth Amendment. *Herring v. United States*, 555 U.S. 135, 139 (2009).

In *United States v. Leon*, however, the Supreme Court recognized the good-faith exception to the exclusionary rule for searches conducted pursuant to warrants.  Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the exclusionary rule should not be applied, when an officer, acting with objective good faith, has obtained a search warrant from a judge and acted within its scope.  *See*

63

*Leon*, 468 U.S. at 920-21.  Nonetheless, the *Leon* Court noted four situations in which the suppression of evidence would still be appropriate:  (1) when the judicial officer issues the warrant on a deliberately or recklessly false affidavit; (2) when the judicial officer wholly abandons his judicial role; (3) when the warrant is issued on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when the warrant is so facially deficient that an officer could not reasonably presume it to be valid.  *Id.* at 923.

In *Blake*, the FBI applied for and obtained search warrants for defendant Tara Jo Moore's Facebook account that, similar to the case at bar, required Facebook to disclose virtually every type of data associated with Moore's account, and then after that disclosure, authorized the government to seize information that constituted fruits, evidence, and instrumentalities of a specified crime from that cache of data.  *Blake*, 868 F.3d at 966-67.  The Eleventh Circuit expressed its concern that this two-stage procedure violated the particularity clause and essentially amounted to "the internet-era version of a 'general warrant.'"  *Id.* at 974.  Nonetheless, the court did not decide whether the Facebook warrants at issue violated the Fourth Amendment because the warrants fell within the *Leon* good-faith exception.  *Id.*  Specifically, the court found (1) that the warrants were

supported by probable cause and (2) that whether or not they violated the particularity requirement was "not an open and shut matter." *Id.* at 975 ("[I]t is a close enough question that the warrants were not so 'facially deficient' that the FBI agents who executed them could not have reasonably believed them to be valid.").

In the case at bar, the Court need not decide whether the warrant violated the particularity requirement because the warrant falls within the *Leon* good-faith exception. *See United States v. Panky*, No. 4:17-cr-23-11-HLM-WEJ, 2017 WL 9478491, at *2 (N.D. Ga. Nov. 28, 2017) (declining to consider whether search warrant for data from Facebook violated the Fourth Amendment because warrant fell within *Leon* exception), *report and recommendation adopted*, 2017 WL 6372242 (N.D. Ga. Dec. 13, 2017). Contrary to Thomas's arguments, SA Winn's affidavit in support of the warrant sufficiently established probable cause to believe that Thomas's Facebook account would yield evidence of alleged criminal activity. Likewise, it cannot be said that the warrant was so facially deficient that the executing officers could not have presumed it to be valid. The warrant was issued and executed in July 2017, two months before *Blake* was decided. *See also Panky*, 2017 WL 9478491, at *2 ("This timing . . . means that there was nothing in way of recent case law to alert authorities to the fact that this warrant may have been

questionable.").  Though Thomas contends that the government should have been aware that *Blake* was pending, he points to no authority to support his position that litigation concerning an issue was ongoing is relevant to good faith analysis. Moreover, the warrant was more constrained in time in that it limited the data seized to specific items during a specific time period,[14] whereas the warrants at issue in *Blake* apparently did not cabin the request to a particular time period at all. *See Blake*, 868 F.3d at 966-67, 974.  As a result, agents who executed the warrant in this case were essentially in the same position as those in *Blake* and *Panky—i.e.,* they had no reason to suspect that a warrant might violate the Fourth Amendment's particularity requirement.  Accordingly, the motion to suppress should be **DENIED.**

### C.    Summary

For the foregoing reasons, is **RECOMMENDED** that Thomas's Motion to Suppress Evidence [Doc. 34] be **DENIED**.

---

[14] The Court notes that the temporal limitation described in Attachment B to the warrant and application appears to have been applied only to the review and/or "seizure" of specific information from the large cache of data aggregated, copied, and disclosed by Facebook.  (*See* Gov't Ex. 7.)  To better address the concerns identified in *Blake* and align more directly with the *Blake* Court's recommendations, that temporal restriction should have been applied to the initial gathering, aggregation, copying, and disclosure of data, not simply upon the review and seizure of information from the data cache.  *See Blake*, 868 F.3d at 974.

## IV.    Thomas's Motion to Suppress Identification Testimony [35]

Thomas moves to suppress identification testimony of Shanavia McCall and Anquaneice Jones, each of whom identified Thomas to SA Winn.  [Doc. 35.] Thomas argues that the identification procedures that SA Winn were unduly suggestive and unreliable.  After setting out the applicable legal standard, the Court addresses each identification separately.

### A.    Applicable Standard

To determine whether an out-of-court identification procedure violates due process, courts apply a two-factor test.  First, the Court considers whether law enforcement used an unduly suggestive identification procedure.  *Perry v. New Hampshire*, 565 U.S. 228, 241-42 (2012); *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001).  If the Court concludes that the identification procedure was not unduly suggestive, then the inquiry ends.  If, however, the Court concludes that it was unduly suggestive, then the Court considers whether, under the totality of the circumstances, the identification was nevertheless reliable.  *Diaz*, 248 F.3d at 1102.  The Supreme Court has identified factors the Court should consider to determine the reliability of an identification, including:  (1) the opportunity the witness had to view the suspect; (2) the witness's degree of attention when she viewed the suspect; (3) the accuracy of the witness's prior description of the

67

suspect; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the identification.  *Id.* (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).

###    B.    Discussion

With respect to McCall, Thomas argues that the identification procedure that SA Winn used was suggestive because the context of SA Winn's interview with McCall was to discuss Pendergrass and Thomas, and during the interview, SA Winn showed McCall a single photograph of Thomas from DDS.  Then, after having identified Thomas as the person in the photograph, she went on to identify Thomas in one of the robbery videos he showed her.  [Doc. 54 at 10.]  Thomas also argues that the identification was not sufficiently reliable because McCall did not include details about Thomas when she identified him and instead focused on his shoes.  [*Id.* at 10-11.]  Thomas additionally argues that McCall was uncertain and not credible at the evidentiary hearing because she was unsure of details regarding basic questions, took long pauses before responding to questions, and expressed hesitation in answering a question out of concern that she would give the wrong answer.  [*Id.* at 11.]  Thomas further contends that McCall's testimony at the hearing was biased to curry favor with the government because, after the identification, she was paid by the government.  [*Id.*]

68

As to Anquaneice Jones, Thomas argues that the identification procedure was unduly suggestive because SA Winn showed her a single photograph of Thomas and that Anquaneice Jones understood that Winn was referring to Thomas. [Doc. 54 at 11.]  Thomas also argues that the procedure was unreliable because, although Anquaneice Jones stated that she had seen "Little" a few times, Anquaneice Jones was not questioned about the specifics of those encounters.  [*Id.* at 11-12.]  Thomas further argues that Anquaneice Jones's description of "Little" prior to seeing the photograph was inconsistent with Thomas's physical characteristics.

The Court disagrees that either of the identifications here violated due process.  Courts have concluded that showing a witness only one photograph is unduly suggestive.  *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 108-09 (1977); *United States v. Cannington*, 729 F.2d 702, 711 (11th Cir. 1984); *United States v. Cueto*, 611 F.2d 1056, 1064 (5th Cir. 1980).  But even if displaying a single photograph to McCall and Anquaneice Jones were unduly suggestive, the Court readily concludes that the identifications were sufficiently reliable.

Turning first to McCall's identification, she testified at the evidentiary hearing in this case that she knew Thomas socially, as Thomas lived in an

69

apartment upstairs from her during 2015 and 2016. [Doc. 49 at 6.] For nearly a two-year period, they saw and spoke with each other frequently, sometimes socializing for hours at a time. [*Id.* at 7.] The last time she saw Thomas was in the summer of 2017. [*Id.* at 7-8.] She also knew Thomas's nickname to be "Face." [*Id.* at 10.] She would call him "Face," as would others who lived in their neighborhood. [*Id.*] She was familiar with his mannerisms, his eyes, and his shoes, all of which made her 100% confident in her identification of him as one of the robbers in the videos. [*Id.* at 13-15, 22.] Thus, even if McCall's identification of Thomas from the DDS photograph or the video was influenced by SA Winn, her identifications are independently reliable.

The Court similarly concludes that Anquaneice Jones's identification of Thomas as the individual in the photograph that SA Winn showed her during her interview should not be suppressed. Anquaneice Jones was familiar with Thomas's appearance because they had encountered each other socially. Before she was shown the photograph, she accurately described Thomas's build and age. She also described him as having distinctive scar or burn-mark on his face and "crazy" eyes. Anquaneice Jones also paid close attention to Thomas. For example, during her videotaped interview, she told SA Winn and Detective Dorminy that she was

70

intrigued by the scar on Thomas's face, but that she was apprehensive to ask him about it.  The videotaped interview leaves no doubt that Anquaneice Jones also demonstrated a high level of certainty during the interview that Thomas was the person in the photograph that SA Winn showed her, and there is no indication that her memory of his appearance was materially inaccurate.

Thomas argues that Anquaneice Jones's description of his was not accurate, pointing out that Anquaneice Jones was not asked to elaborate on how she knew Thomas, that he was at least five feet six inches tall, and that she described his eyes as "crazy" in contrast to McCall, who described his eyes as "pretty."  [Doc. 54 at 12.]  Thomas also argues that Anquaneice Jones did not provide a description of Thomas's skin tone or hairstyle, and that she pointed out the scar was on the left side of his face, when, in fact, it was on the right.  [*Id.*]  While McCall's description could have been more comprehensive, the physical description that she gave was generally consistent with Thomas's physical features.  Applying the *Biggers* factors here, the Court concludes that the identification should not be suppressed.  To the extent that Thomas believes that either McCall's or Anquaneice Jones's identifications were unreliable, Thomas may challenge the reliability of their identifications at trial.  *See Perry*, 565 U.S. at 239.

71

Accordingly, it is **RECOMMENDED** that the Thomas's motion to suppress identification testimony be **DENIED**.

## V.      Conclusion

For the foregoing reasons, it is **RECOMMENDED** that Thomas's Motion to Suppress Evidence Seized Pursuant to Unconstitutional Search Warrants [Doc. 34] and Thomas's Motion to Suppress Identification Testimony [Doc. 35] be **DENIED**.  It is further **RECOMMENDED** Pendergrass's Omnibus Motion to Suppress Evidence [Doc. 37]; and Pendergrass's Amended Motion to Suppress [Doc. 41] be **GRANTED** in part, as to the LG cell phone seized on March 10, 2017, and **DENIED** in part, in all other respects.

There are no matters pending before me, and I have not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

IT IS SO RECOMMENDED this 11th day of September, 2018.

_____

JOHN K. LARKINS III
United States Magistrate Judge

72