# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DONTIEZ PENDERGRASS, | : | MOTION TO VACATE |
| Fed. Reg. No. 71061-019, | : | 28 U.S.C. §2255 |
| Movant, | : | |
| | : | CRIMINAL NO. |
| v. | : | 1:17-CR-315-LMM-JKL-1 |
| | : | |
| UNITED STATES OF AMERICA, | : | CIVIL ACTION NO. |
| Respondent. | : | 1:22-CV-3862-LMM-JKL |

## ORDER AND FINAL REPORT AND RECOMMENDATION

Movant Dontiez Pendergrass has filed the instant *pro se* motion to vacate

pursuant to 28 U.S.C. §2255, and seeks to challenge the constitutionality of his

convictions and sentences in the Northern District of Georgia.  (Doc. 236).  As an

initial matter, Movant's motion for an extension of time to file a reply [Doc. 245] is

**GRANTED** *nunc pro tunc*, and his reply [Docs. 248, 249] is accepted as filed.  His

motion for appointment of counsel [Doc. 245] contained in that same pleading will

be denied as moot.

## I.    RELEVANT FACTUAL AND PROCEDURAL HISTORY

### A.    Evidence Presented at Trial

Within an eight-week span, a string of five armed robberies occurred in

Gwinnett County, Georgia, all of which appeared to be related.  The evidence at trial

showed the following in connection with those robberies:

1.      The China Star Restaurant in Tucker, Georgia

On November 19, 2016, the owner and an employee of the China Star restaurant had just finished cleaning out the fryer and dumping the oil in the grease trap behind the restaurant when an armed black man, his face covered from the nose down, pushed the employee into the restaurant. (Doc. 214 at 45). The robber held a silver and black pistol in his left hand, pointed it at the owner, and demanded money. (*Id.* at 45-47). The owner handed over cash from that evening's deliveries, which was in his pants pocket. (*Id.* at 46). As the robber moved toward the cash register and unsuccessfully tried to open it, the owner ran out of the front door with his employee and called the police. (*Id.* at 46-47). Restaurant surveillance captured the incident on video, and at trial the video and still photographs taken therefrom were presented to the jury. (*Id.* at 48-54). The video and photos showed that the robber wore a red hooded shirt under a long-sleeved black shirt with a distinctive white pattern on it. (*Id.*; Doc. 174-4 at 1-3).

2.      Polo's Taqueria Restaurant in Lawrenceville, Georgia

Sometime between midnight and one o'clock a.m. on December 24, 2016, Israel Morales, an employee of Polo's Taqueria, was sitting outside of the restaurant waiting for his ride when he was approached by three armed black men. (Doc. 213 at 220-21). All three men had their faces covered from the nose down, and two were armed with pistols while the other was holding a chrome-barrelled rifle with a scope

on it.  (*Id.* at 222; Doc. 174-3 at 58-59; Doc. 215 at 113-14).  One of the men shot out the glass in the front door of the restaurant to gain entry before forcing Morales inside, where the robbers demanded that he open the safe.  (Doc. 213 at 222-24).  After Morales told the men that he did not know how to do so, they took $200 from the cash register and ran out of the back door.  (*Id.* at 223, 227, 246).  Morales waited until he was sure the men were gone before he called the police.  (*Id.* at 227).  Meanwhile, the owner of the restaurant and another employee were present during the robbery, saw the three men approach Morales, and called 911.  (*Id.* at 233-35).

Surveillance cameras also recorded this robbery, and the jury was shown the video and still photos taken therefrom.  (*Id.* at 235-48).  The robber who took the cash from the register was tall and carried a black and silver pistol in his left hand, wore gloves and a red shirt underneath a long-sleeved black shirt with a distinctive white pattern, and over his clothes he wore a single-strap cross-body backpack.  (Doc. 174-3 at 1-8, 11-21).  When processing the scene, police recovered an intact bullet cartridge from inside the restaurant near the front windows.  (*Id.* at 36-39; Doc. 240-1 at 11).

3.   Discount Grocery in Tucker, Georgia

On January 1, 2017, Discount Grocery – which is in the same shopping center as the China Star restaurant – was robbed.  (Doc. 213 at 61-62; Doc. 240-1 at 15-16).  On that night between 9:00 and 9:30 p.m., owner Sunil Joseph was closing the

store and was behind the counter when all of a sudden he saw an armed black man, whose face was covered from the nose down, coming toward him. (Doc. 213 at 63; 174-2 at 1). Joseph tried to grab the gun before he saw two more armed black men, both of whom also had their faces covered. (Doc. 213 at 63, 71). One of the men told Joseph to get on his knees, but after Joseph refused and began to back up, the robber pistol-whipped him to force him to comply. (*Id.* at 64). One of the other robbers – who had on white gloves, a red headwrap, and wore a single-strap cross-body backpack, and who Joseph described as tall with dreadlocks – said he was going to "shoot [Joseph] up" and started to move toward Joseph, who was on his knees. (*Id.* at 63-65; Doc. 174-2 at 5).

As he was coming closer, the robber pointed a black and silver gun that he was holding in his left hand directly at Joseph. (Doc. 213 at 65-66). After Joseph unsuccessfully attempted to reach for his own gun the assailant shot him three times at close range, immediately fled, and Joseph called 911. (*Id.*). As a result of those gunshots, Joseph's cheekbone was shattered, he lost his right eye as well as his sense of smell and taste, he is now paralyzed on half of his face, and he has limited mobility in his right arm. (*Id.* at 65-66). Surveillance cameras captured the robbery, and the jury was shown the video and still photos therefrom. (*Id.* at 67-75).

During their investigation of the scene officers found droplets of blood on the other side of the counter from where Joseph was shot. (Doc. 215 at 127). The blood

was collected for DNA testing because, *inter alia*, Joseph was shot on the other side of the counter, the suspect ran in the exact path the blood was located, and the crime scene technicians thought it could have belonged to the suspect. (*Id.* at 127, 132-33; Doc. 174-2 at 26). DNA was later collected from Movant [Doc. 215 at 127], and FBI forensic DNA expert Jeremy Fletcher testified that the DNA profile from the blood on the floor and the DNA profile extracted from Movant were the same. (Doc. 213 at 185-86). Agent Fletcher further explained that when the DNA was analyzed statistically, it was 690 septillion times more likely that the blood came from Movant than from an unknown person.[1] (*Id.* at 185-86). Three shell casings also were recovered from the floor. (*Id.* at 21, 82, 87; Doc. 174-2 at 23-24, 31, 34).

4. The Bonita Coin Laundry in Lilburn, Georgia

On January 4, 2017, Bonita Coin Laundry employee Sonia Prudencio was working and her fourteen-year-old daughter Andrea, her ten-year-old son, and several patrons with young children also were at the laundry. (Doc. 214 at 72-106). Just before 9:00 p.m., Andrea was sitting close to the entrance when two armed black men entered the laundry with their faces covered except for their eyes. (*Id.* at 72-76; Doc. 174-5 at 1-4). The taller of the men was wearing a red hooded sweatshirt and white gloves and was holding a black and silver pistol in his left hand. (Doc.

---

[1]      According to Agent Fletcher, 690 septillion is equal to sixty-nine followed by twenty-five zeros, or 690,000,000,000,000,000,000,000,000. (Doc. 213 at 186).

214 at 74-77; Doc. 174-5 at 1-5).  That robber grabbed Andrea, brought her toward Ms. Prudencio, took Ms. Prudencio's phone, and told everyone else to get on the floor.  (Doc. 214 at 74-75, 81; Doc. 174-5 at 5-9).  He then brought Andrea to the safe, forced her to open it, and stole about $800 to $850 in cash and coins.  (Doc. 214 at 76-77; 174-5 at 5, 7, 17-18).  One of the patrons described the tall robber as having "funny, curly, messed up hair."  (Doc. 214 at 105-06).

The other robber, dressed in black, began to threaten the customers and threw them down on the floor in the back of the laundry.  (*Id.* at 84-85).  After bringing Ms. Prudencio and Andrea to the back, the robbers locked everyone in the bathroom and blocked the door with a pool table so that they could escape.  (*Id.* at 86).  Surveillance video and still photographs therefrom were presented to the jury.  (*Id.* at 74-86).  The video and photographs did, in fact, show a tall robber wearing a red hooded shirt, white gloves, and a covering on his face, holding a black and silver pistol in his left hand.  (Doc. 174-5 at 5, 7, 17-18).

5.    Best Wings Restaurant in Lawrenceville, Georgia

Sometime after closing, between 3:00 and 4:00 a.m. on January 15, 2017, Best Wings restaurant patron Saurilius Kyzelius and employee Brittany Anderson left the restaurant and approached Anderson's car when two armed black men accosted them, one of them holding a gun in his left hand.  (Doc. 214 at 137-41, 145, 155; Doc. 174-6 at 3, 10).  The robbers took $300 cash from Kyzelius's wallet and

demanded the safe key from Ms. Anderson.  (Doc. 214 at 141-42).  At that point the person in charge of security at Best Wings came outside and began to struggle with the taller left-handed robber holding the gun, a shot rang out, hit the fender of the car right next to Kyzelius, and Kyzelius was hit in the leg with some of the fragments from the car.  (*Id.* at 143-44, 155-56; Doc. 174-6 at 4).

The robbers then ordered the three of them to go inside and told them to get on their knees, all the while continuing to demand the safe key from Ms. Anderson. (Doc. 214 at 141-42, 148).  Ms. Anderson, however, kept telling them that she did not have the key to the safe.  (*Id.* at 148).  After a car pulled up to the front of the restaurant the robbers ran away across the street and jumped over a fence into a neighborhood toward where Movant's residence was located.  (*Id.* at 152-54; Doc. 215 at 159-60).  Surveillance video and still photographs therefrom were presented to the jury, including pictures of the bullet hole on Ms. Anderson's car.  (Doc. 214 at 123, 126, 139-56; 174-6 at 20-22).  The photographs showed that the taller robber wore a red shirt and white gloves, and his face was covered from the nose down. (Doc. 174-6 at 9).  One shell casing was recovered from the parking lot.  (*Id.* at 17-19; Doc. 214 at 173-74, 176-77).

6.   <u>Key Points of the Investigation</u>

In January 2017 FBI Special Agent Matthew Winn was contacted by the Gwinnett County Police Department ("GCPD") seeking assistance with investigating the five armed robberies.  (Doc. 49 at 41, 47, 46; Doc. 215 at 121). When he began his investigation, SA Winn noticed consistencies throughout the robberies with at least one of the suspects, *i.e.,* a tall black male with an athletic build who carried a semi-automatic silver and black pistol – which appeared to be the same gun across all five robberies – in his left hand, always covered his face from the nose down, and in more than one of the robberies wore white gloves, a distinctive shirt, and/or a single-strap cross-body backpack.  (Doc. 215 at 136-41).

In an attempt to locate that suspect, SA Winn obtained a court order for a tower dump which potentially could provide common phone numbers utilized near more than one of the robberies.[2]   (Docs. 73-1, 73-2).  To that end, SA Winn sought tower data information on the dates, and within two hours, of each of the robberies. (Doc. 49 at 48; Doc. 215 at 121-23).  When SA Winn learned that Movant's phone number ending with 1011 had utilized towers in the vicinity of three of the robberies, he sought a court order to obtain historical cell site location information for that

---

[2]    A tower dump is a process through a court order where a law enforcement agency submits a request to the major cell phone companies seeking information for all cell phones that used cell towers at a specific location on a specific date within a specific window of time.  (Doc. 49 at 48; Doc. 215 at 121-22).

phone number.[3]  (Doc. 49 at 48-49; Doc. 215 at 64, 125).  At some point, SA Winn

obtained geo-location information from Google associated with Movant's email

address.[4]  (Doc. 49 at 102-04).

FBI Special Agent Matthew Carman, an expert in cellular analysis and in

analyzing Google geo-location data, testified that he had analyzed the data from the

tower dump, the historical cell data analysis for Movant's phone number ending in

1011, and Google geo-location data that SA Winn had obtained for an email address

associated with  Movant.  According to SA Carman, the data revealed that on the

night of the Polo's Taqueria robbery Movant's cell phone "pinged" off a cell tower

covering that area at 10:38 p.m., 12:23 a.m., and 12:35 a.m., and Google's geo-

location data revealed that Movant's phone was near the restaurant about an hour

before the robbery, which occurred between midnight and 1:00 a.m.  (Doc. 215 at

66, 76-77, 88; Doc. 174-1 at 1-11).

---

[3]     Whereas a tower dump will show which phones use a particular tower,
historical cell site information focuses on a specific phone – that is, every phone call
or text from or to that particular phone during a specified period of time, and which
cell phone tower was utilized when making and receiving those calls.  (Doc. 215 at
64, 125).  In both a tower dump and cell site historical data, the fact that a person's
phone is in proximity to a tower would indicate that the person using that phone also
would be in close proximity to that tower.  (*Id.* at 122).

[4]     Google collects data on devices, such as telephones, that utilize particular
email addresses.  (Doc. 215 at 80).  The geo-location data will give a date and time
that the device utilized or made contact with a particular access point, the latitude
and longitude of the access point, and a radius of how far out from that point the
device could have been.  (*Id.*).

On the night that the Discount Grocery was robbed, Movant's cell phone "pinged" off of a cell tower nearby at 7:30 and 8:41 p.m., and Google's geo-location data showed that Movant's phone was near Discount Grocery approximately twenty minutes before the robbery and shooting, which occurred between 9:00 and 9:30 p.m.  (Doc. 215 at 92-93; Doc. 174-1 at 1-8, 12-14).  And finally, when the Best Wings restaurant was robbed between 3:00 and 4:00 a.m., Movant's cellphone "pinged" off of cell towers near Best Wings seven times between 3:25 and 3:58 a.m., and Google geo-location data showed that Movant was present within seventy meters of Best Wings just before the robbery and was back near his residence at 1044 Wenham Lane within minutes afterward.  (Doc. 215 at 95-96; Doc. 174-1 at 1-8, 15).

7.    Ballistic Analysis

The Government also presented expert testimony from ballistics expert Zachary Weitzel with the GBI.  (Doc. 215 at 20-53).  Investigator Weitzel testified that based on his review of the evidence, the intact bullet cartridge from Polo's Taqueria, the three shell casings from Discount Grocery, and the shell casing from Best Wings all were cycled through the same .40 caliber Smith and Wesson pistol. (*Id.* at 35-41).

8.      Evidence Recovered During the Search of Movant's Home and Car

On March 30, 2017, law enforcement executed search warrants for Movant's home and car that was parked outside.  (Doc. 215 at 109-113-14).  In the basement of the house, officers recovered a black long-sleeved shirt with a distinctive white pattern on it that looked like the shirt the robber wore during the Polo's Taqueria and China Star restaurant robberies, as well as a black single-strap cross-body backpack like the one seen in the videos of the Polo's Taqueria and Discount Grocery robberies.  (*Id.* at 109-112, 138-44, 146; Doc. 174-3 at 56-57).  In Movant's car, officers found a rifle like the one used by one of the robbers during the Polo's Taqueria robbery.  (Doc. 215 at 115, 144-45; Doc. 174-3 at 58-59).  Notably, Movant admitted to law enforcement that the shirt and gun were his, that he had been using the phone number ending in 1011 until March 10, 2017, and that he was left-handed. (Doc. 215 at 149-51).

## B.      **The March 10, 2017, Shooting of Movant**

Meanwhile, on March 10, 2017, Gwinnett County Police ("GCP") Detective Brian Dorminy was called to investigate the shooting of Movant – which occurred after the robberies and appeared to be unrelated thereto – earlier that morning.  (Doc. 49 at 143-44).  Through Movant's then-girlfriend Anquaneice Jones, Detective Dorminy learned that Movant lived with her at 1044 Wenham Lane in Lawrenceville and that he drove a gold Porsche Cayenne.  (*Id.* at 145).  Ms. Jones also gave

11

Detective Dorminy Movant's phone number, which was the same phone number ending with 1011. (*Id.* at 82, 144-45). Detective Dorminy drove to the location of the shooting and found the gold Porsche Cayenne. (*Id.* at 145-46, 159).

Detective Dorminy impounded the vehicle, transported it to the GCPD, and obtained a search warrant to search the vehicle for "handguns, long guns, drugs, bullets, blood and/or DNA." (Doc. 41-1 at 1; Doc. 49 at 149). During the search, he seized ammunition, a firearm, an unspecified quantity of green leafy material from which he took samples for DNA testing, and a gold LG phone, the owner of which he was unaware at the time, and then released the car to Movant's mother who was the registered owner. (Doc. 49 at 146-47; Doc. 41-1 at 7). Thirty-two days later on April 17, 2017, Detective Dorminy obtained a search warrant for the LG phone. (Doc. 49 at 146-47). When questioned about the delay, Detective Dorminy stated that he was working on other investigations that were pending simultaneously. (*Id* at 149). The LG phone belonged to Movant, and apparently it revealed some incriminating photos and videos of Movant in connection with an armed robbery in Tennessee. (Doc. 240-1 at 42).

## C. <u>Procedural History</u>

A federal grand jury in the Northern District of Georgia indicted Movant on two counts of Hobbs Act Robbery of Polo's Taqueria and the Bonita Coin Laundry in violation of 18 U.S.C. §1951 (Counts 3 and 7), three counts of attempted Hobbs

Act Robbery of the China Star restaurant, Discount Grocery, and Best Wings restaurant in violation of 18 U.S.C. §1951 (Counts 1, 5, and 9), three counts of brandishing a firearm during, and in relation to, the armed robberies of the China Star restaurant, Polo's Taqueria, and the Bonita Coin Laundry, in violation of 18 U.S.C. §924(c)(1)(A)(ii) (Counts 2, 4, and 8), and two counts of discharging a firearm during, and in relation to, the armed robberies of Discount Grocery and the Best Wings restaurant, in violation of 18 U.S.C. §924(c)(1)(A)(iii) (Counts 6 and 10).[5]   Leigh Finlayson was appointed to represent Movant; however, Movant requested new counsel a month later, Mr. Finlayson moved to withdraw, and the Court appointed R. Gary Spencer on October 19, 2017.  (Docs. 23, 29, 30, 31).  Mr. Spencer represented Movant until February 4, 2019, when the Court granted Mr. Spencer's motion to withdraw [Doc. 103] and Movant's motion for new counsel [Doc. 99] and appointed Tanya F. Miller to represent Movant [Doc. 105].

---

[5]   The indictment also charged Shawn Thomas with the Polo's Taqueria and Discount Grocery armed robberies, noted that a third unidentified person aided and abetted Movant and Thomas therewith, and also noted that an unidentified second person aided and abetted Movant in connection with the Bonita Coin Laundry and Best Wings robberies.  (Doc. 1).

1.   <u>Motions to Suppress</u>[6]

Mr. Spencer filed an Omnibus Motion and Amended Motion to Suppress Evidence on Movant's behalf [Docs. 37, 41].  Specifically, Movant challenged:  (1) evidence seized from the Porsche Cayenne on March 10, 2017; (2) evidence seized from the search of Movant's LG phone on April 17, 2017; (3) evidence seized from 1044 Wenham Lane on March 30, 2017; (4) evidence seized from the Porsche Cayenne on March 30, 2017; and (5) the tower dump information the Government obtained pursuant to a court order.  (Docs. 37, 41, 55, 66).  I held an evidentiary hearing on January 29, 2018, during which the following witnesses testified:  (1) Shanavia McCall, a former neighbor of co-defendant Thomas; (2) SA Winn; (3) Jason Cabrera, an Assistant Chief Community Supervision Officer with the Georgia State Department of Supervision; (4) Detective Dorminy; (5) Ms. Jones; and (6) Alicia Jones, Ms. Jones's mother.

a.   <u>The First Search of Movant's Car and Cell Phone</u>

During the hearing and the briefing that followed, the parties did not dispute that Detective Dorminy had lawful access to Movant's car on March 10, 2017, or that the cell phone was outside the scope of the warrant.  (Doc. 80 at 24).  Consequently, the only issue I needed to resolve was whether the incriminating

---

[6]     Defendant Thomas also filed a motion to suppress evidence and identification testimony, which I heard at the same time as Movant's.  (Docs. 34-35, 49).  I will only discuss the facts here as relevant to Movant's motions.

nature of the cell phone was "immediately apparent" such that Detective Dorminy's seizure of the contents thereof would have been lawful. (*Id.*). I found the answer to be in the negative, that Detective Dorminy lacked sufficient probable cause to believe that the phone contained evidence of Movant's shooting, and, therefore, that any evidence obtained from the phone should be suppressed. (*Id.* at 25-26).

   b.   The Tower Dump

The court order for the tower dump SA Winn obtained sometime in March 2017 was sought pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. §2701 *et seq.* (Docs. 73-1, 73-2). At that time, the law in this Circuit provided that communication records obtained under the SCA could be obtained by court order without the need of a search warrant; therefore, I found that the good faith exception to the exclusionary rule applied and that the motion to suppress the tower dump records should be denied.[7] (Doc. 80 at 43).[8]

---

[7] After the parties' initial briefs but before I entered my R&R, the United States Supreme Court decided *Carpenter v. United States*, __ U.S. __, 138 S. Ct. 2206, 2221 (June 22, 2018), which held that the Government must obtain a warrant before obtaining historical cell site location information. The Supreme Court specifically noted in *Carpenter* that its decision was narrow and it did not express a view on tower dumps. *Id.* at 2220. Regardless, the good faith exception to the exclusionary rule applied because pre-*Carpenter* law provided that tower dump information could be obtained without a search warrant.

[8] In February of 2019, Movant filed a subsequent motion to suppress the tower dump records based on a recent article discussing *Carpenter* and its implications with regard to tower dumps. (Doc. 102). That motion was denied, largely for the same reasons as the initial motion. (Docs. 106, 116). In the District Judge's order

c.   The March 30, 2017, Search of Movant's Residence and Car

Movant also moved to suppress all of the evidence seized from the Wenham Lane residence on March 30, 2017, and challenged:  (1) the initial warrantless entry of the residence under the guise of a probation check; (2) the first search warrant obtained for the residence, which authorized the seizure of marijuana, digital scales, plastic bags, and ledgers therein [Doc. 48-5 at 1-7]; and (3) the second search warrant obtained for the residence, which authorized the seizure of the evidence related to the robberies that the officers observed during the execution of the initial warrant [Doc. 48-5 at 8-14].

1.   *Events Leading up to the March 30, 2017, Search*

After SA Winn received the tower dump information, he learned from the GCPD that the phone number ending with 1011 was associated with Movant and that Movant had been shot on March 10, 2017.[9]  (Doc. 49 at 75-76).  SA Winn received the report of the shooting, within which was information from Ms. Jones that Movant lived with her at 1044 Wenham Lane.  (*Id.* at 49-51).  Significantly, the

---

adopting my R&R over Movant's objections, the District Judge noted that Movant's objections amounted to "what is essentially a third bite at the apple."  (Doc. 116 at 3).

[9]   It was at that point SA Winn sought a court order for the historical cell site location information for Movant's phone.  (Doc. 49 at 48-49).  Movant, however, did not challenge the cell site data in the motions to suppress.

residence was approximately one-third of a mile from the Best Wings restaurant after which the robbers fled the scene, hopped a fence into the neighborhood, and ran toward that residence. (*Id.*). SA Winn conducted surveillance of the Wenham Lane address and observed Movant going back and forth between the residence and a gold Porsche Cayenne registered to Movant's mother that was parked at the house, and noticed that Movant matched the physical description of one of the robbers. (*Id.* at 50, 60).

After identifying Movant at the residence, SA Winn learned from Movant's criminal history that he was on probation. (*Id.* at 52). The conditions of Movant's probation included, among other things, that he refrain from criminal conduct, that he refrain from using narcotics and other dangerous drugs, that he permit his probation officer to visit him in his home and elsewhere, and that he not change his place of residence without permission of his supervising officer. (Doc. 48-5 at 24-25). Because Movant appeared to be living at the Wenham Lane residence – which was not the address he had listed with probation – SA Winn contacted the Georgia state probation office and advised that Movant was a potential suspect in his investigation and appeared to be living at a different residence than that which was on file. (Doc. 49 at 53).

2.      *Facts and Findings*

a.      *The Initial Entry into the Residence*

On the morning of March 30, 3017, several probation officers went to the Wenham Lane residence to conduct a field visit and allowed SA Winn to accompany them.  (*Id.* at 54, 83, 86-87).  Probation Officer Cabrera led the team of officers to the front door of the residence and knocked on the door.  (*Id.* at 55, 119).

A woman answered the door and a strong odor of marijuana came out from inside the house.[10]  (*Id.*).  Officer Cabrera introduced himself and told her they were there to visit with Movant, to which she responded that he was in the basement.  (*Id.* at 56, 120).  She turned and walked away, leaving the front door open, the officers entered the house, told the woman they needed to see Movant, and she turned around and allowed the officers to follow her into the basement.  (*Id.* at 120).

I considered the totality of the circumstances and found that based upon the information the officers knew – that is, that Movant was not residing at the address reported to probation in addition to the strong smell of marijuana when the door opened – the officers had reasonable suspicion to believe that Movant violated the

---

[10]     Although Ms. Jones and her mother testified that there was no such odor and that no one inside the home was smoking marijuana that morning [Doc. 49 at 167, 172], I found Officer Cabrera's and SA Winn's testimony to be more credible.  (Doc. 80 at 10 & n.4, 35).

conditions of his probation.  (Doc. 80 at 30-31).  Thus, I concluded that this initial search and sweep was lawful.  (*Id.* at 34).

### b.     *The First Search Warrant*

When the officers encountered Movant in the basement, he became belligerent, and one of the officers placed him in handcuffs.  (Doc. 49 at 57, 121).  While conducting a safety sweep, officers noticed items associated with marijuana, and Officer Cabrera sought a search warrant to look for marijuana and related paraphernalia.  (*Id.* at 57, 124).  While waiting for that search warrant to be issued, the officers removed everyone from the home and detained Movant.  (*Id.* at 58, 100, 123, 137).

Thereafter, a state court magistrate issued a warrant authorizing the search and seizure of marijuana, drug scales, small plastic bags, and ledgers at the Wenham Lane residence.  (Doc. 48-5 at 1-7).  Based on the detection of the odor of marijuana as well as other circumstances described in the affidavit – *i.e.,* the rapid movements of persons in the house when the officers arrived and Movant's belligerence – I found that the first search warrant was supported by probable cause and was legal. (Doc. 80 at 36).

### c.     *The Second Search Warrant*

While the officers were executing the first search warrant, SA Winn observed a shirt that appeared to match the unique shirt depicted in surveillance video of two

of the robberies, a single strap cross-body backpack depicted in more than one of the robberies, ammunition, a scope for a rifle, a police scanner, and a ballistic vest or body armor.  (Doc. 49 at 58-59, 110).  The shirt was on top of a hamper in Movant's bedroom, the backpack was in the corner of a common room in the basement, the ammunition was found on top of a refrigerator in the kitchen area of the basement, and the scanner and scope were seen on a kitchen counter.  (*Id.* at 62-64, 110, 112-13).  At that time officers did not seize any of the items other than the drugs; instead, they obtained a second search warrant specifically authorizing the seizure of those items.  (*Id.* at 59; Doc. 48-5 at 8-14).  I concluded that these facts were sufficient to establish probable cause for the officers to believe that the evidence was related to the robberies and other offenses, and, therefore, that the search was permissible. (Doc. 80 at 36-38).

### d.   *The March 30, 2017, Search of Movant's Car*

After officers seized the evidence believed to be related to the robberies, SA Winn observed through the windows of the Porsche Cayenne a handgun and what appeared to be a rifle case that could hold an AR-15-style rifle, which was one of the weapons used in the robberies.  (Doc. 49 at 60-62).  SA Winn related the information to Detective Dorminy, who applied for and obtained a search warrant for the car based on that information.  (*Id.* at 60; Doc. 48-5 at 15-21).  I found that the search was supported by probable cause because there was a sufficient nexus

between the vehicle and the armed robberies and between the vehicle and Movant. (Doc. 80 at 40).

After post-hearing briefing concluded, I entered a report and recommendation ("R&R") on September 11, 2018, in which I recommended granting the motion to suppress the evidence obtained from Movant's cell phone and denying the remainder of the motion.  (Doc. 80).  The District Court adopted my R&R over Movant's objections [Doc. 89] on January 4, 2019.  (Doc. 94).

2.    Motion in Limine to Exclude Google Geo-Location Data

Before trial and through new counsel, Movant filed a motion in limine to exclude, *inter alia*, the Google geo-location evidence showing Movant's whereabouts during the robberies and argued that SA Winn relied on the evidence gathered from the illegal search of Movant's cell phone.  (Doc. 130 at 1-4).  The Court concluded that the Government showed a reasonable probability that such information would have been discovered other than by the tainted source and denied the motion, and the Government introduced that evidence at trial.  (Doc. 215 at 87-88, 92-95; Doc. 219 at 60-61; Doc. 174-1 at 10-15).

**B.    Trial and Appeal**

Movant's jury trial began on June 17, 2019, and lasted five days.  (Docs. 156, 157, 160, 162, 163, 213-216).  During the trial the Government presented the testimony of twenty-seven witnesses, including: the robbery victims; law

enforcement personnel who responded to the robberies, processed the crime scenes, and conducted forensic examinations of the evidence; and SA Winn, who testified about his investigation. As discussed previously herein in Section II.A.7., the Government also presented a ballistic expert, cell-site and Google geo-location data placing Movant in the vicinity of three of the robberies, video and photo evidence from the robberies, and evidence derived from the searches of the Wenham Lane home and subsequent search of Movant's car. On June 24, 2019, the jury convicted Movant of all counts. (Doc. 164). On September 11, 2019, the District Court sentenced Movant to a net total of 552 months, or 46 years, of imprisonment to be followed by five years of supervised release.[11] (Docs. 190, 191).

Movant filed an appeal with the Eleventh Circuit, and raised six issues:

(1) he was prejudiced by the Court's denial of his motion to continue trial;[12]

(2) the Court improperly declined to dismiss Juror No. 20 for cause;

---

[11] Specifically, Movant was sentenced to sixty months for each Hobbs Act Robbery and Attempted Robbery counts (Counts 1, 3, 5, 7, and 9) to run concurrently to each other and to the remaining counts (Counts 2, 4, 6, 8, and 10); eighty-four months on the brandishing counts (Counts 2, 4, and 8), to run consecutive to each other and to all of the other counts (Counts 1, 3, 5, 6, 7, 9, 10); and 120 months for the two discharging offenses (Counts 6 and 10) to run consecutively to each other and to all of the other counts (Counts 1, 2, 3, 4, 5, 7, 8, and 9). (Doc. 3 at 3).

[12] Two weeks before trial, Ms. Miller sought to continue the trial because she had just received a K-9 report from the Government, she needed more time to investigate and prepare for any K-9 expert. (Doc. 134). Ms. Miller indicated that other than the K-9 evidence she was ready for trial. (Id.). Because the District Court decided to exclude the K-9 evidence [Docs. 144, 219], the Court denied the request for a continuance. (Doc. 219 at 53-55).

(3)    SA Winn's testimony contained improper hearsay, violated Movant's confrontation rights, and amounted to improper opinion testimony;

(4)    admission of the geo-location data violated Movant's Fourth Amendment rights;

(5)    the evidence was insufficient to support his convictions; and

(6)    the cumulative effect of these errors rendered his trial fundamentally unfair.

*United States v. Pendergrass*, 995 F.3d 858 (2021). On April 22, 2021, the Eleventh Circuit affirmed Movant's convictions and sentences, and denied his petition to rehear the appeal *en banc* on September 15, 2021. *Id.* Notably, throughout its opinion and in support of its conclusion that the evidence was sufficient to convict Movant, the Eleventh Circuit repeatedly emphasized the significant amount of evidence against Movant,[13] including the patterns and similar modus of operandi evidence indicating that the same person committed all five robberies.[14]

---

[13]    Specifically, the Eleventh Circuit characterized the evidence against Movant as "overwhelming" [*Pendergrass*, 995 F.3d at 874], "formidable" [*id.*], "crushing" [*id.*], "strong" [*id.* at 875], "substantial" [*id.* at 880], an "avalanche of evidence" [*id.* at 875], and a "sea of evidence" [*id.*] – all of which "handily established" [*id.*] and "formidably demonstrated" [*id.* at 882] Movant's guilt in all five robberies.

[14]    The Eleventh Circuit also created a summary chart which included even more evidence to demonstrate the "many similarities among the five robberies." *Pendergrass*, 995 F.3d at 876.

**C.**   **The Instant §2255 Motion**

Movant executed the instant §2255 motion to vacate his sentences on September 7, 2022.  (Doc. 236).  He raises several claims of ineffective assistance of counsel.

Specifically, Movant argues that counsel failed to: (1) challenge the affidavit to the March 30, 2017, search warrant based on the fact that the T-Mobile tower dump did not contain the telephone number ending in 1011, rendering the affidavit untruthful; (2) challenge the DNA analysis; (3) argue that Movant still retained his Fourth Amendment rights which would have undercut support for the March 30, 2017, search; (4) subpoena witnesses that were present on March 30, 2017, to help prove facts from the alleged illegal search; (5) subpoena records in support of the motions to suppress before the Court denied those motions; (6) seek dismissal of the case against Movant based on the deficient warrant; and (7) subpoena records of Movant's "real phone contracts," a chain of custody log for the evidence bag in Gwinnett County, and the chain of custody for the Discount Grocery video.  (Doc. 236).  Movant also attempts to raise two issues related to sentencing, *i.e.,* that his sentences for §924(c) convictions were unlawfully stacked in violation of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018) ("FSA"); and that there was an unfair disparity between his sentence and that of his co-defendant,

Shawn Thomas.  (*Id.*).  For the following reasons, I **RECOMMEND** that the instant §2255 motion be **DENIED**.

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

Congress enacted §2255, authorizing convicted criminal defendants to file a motion to correct sentences that violate federal law, with the intention that the statute serve as the primary method of collateral attack on federally-imposed sentences. *United States v. Jordan*, 915 F.2d 622, 625 (11th Cir. 1990).  Pursuant to §2255, individuals sentenced by a federal court can attack the sentence imposed by claiming one of four different grounds: "(1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose such sentence; (3) that the sentence was in excess of the maximum authorized by law; and (4) that the sentence is otherwise subject to collateral attack." *Id.* (citations omitted); *see generally United States v. Hayman*, 342 U.S. 205 (1952).

"[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  *United States v. Frady*, 456 U.S. 152, 166 (1982).  Movant must establish that the facts surrounding his claim present "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Bowen v. Johnston*, 306 U.S. 19, 27 (1939).

The Court should order an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." As discussed below, Movant's §2255 motion and the record in this case conclusively show that he is not entitled to relief in connection with his claims. Thus, no evidentiary hearing is required.

**B.**     <u>**Analysis**</u>

1.     <u>Movant's Claims are Foreclosed.</u>

All of Movant's claims are procedurally defaulted.  Indeed, the gist of all of his ineffective assistance of counsel claims appears to be Movant's attempt to litigate the suppression motions for the fourth time.  But Movant did not challenge this Court's decision on those motions with the Eleventh Circuit; nor did he raise any sentencing issues on appeal.

"A claim is procedurally defaulted, such that the prisoner cannot raise it in a collateral proceeding, when a defendant could have raised an issue on direct appeal but did not do so."  *Hill v. United States*, 569 F. App'x 646, 647 (11th Cir. 2014); *see also Black v. United States*, 373 F.3d 1140, 1142 (11th Cir. 2004) ("Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a 28 U.S.C. §2255 challenge.").

The movant can "avoid the procedural bar by establishing that either of the following exceptions applies:  (1) cause and prejudice, or (2) a miscarriage of justice

based on actual innocence." *Hill*, 569 F. App'x at 648.  "[T]o show cause for

procedural default [a §2255 movant] must show that some objective factor external

to the defense prevented [the movant] or his counsel from raising [the] claims on

direct appeal and that this factor cannot be fairly attributable to [the movant's] own

conduct." *Lynn v. United States*, 365 F.3d 1225, 1235 (11th Cir. 2004) (per curiam).

"Actual prejudice means more than just the possibility of prejudice; it requires that

the error worked to [the movant's] actual and substantial disadvantage[.]" *Ward v.

Hall*, 592 F.3d 1144, 1179 (11th Cir. 2010).  To demonstrate a miscarriage of justice

based on actual innocence, the movant must demonstrate that "a constitutional

violation has probably resulted in the conviction of one who is actually innocent."

*Lynn*, 365 F.3d 1234-35 (internal quotation marks and citations omitted).  And a

movant claiming that he is actually innocent must show factual innocence rather than

legal innocence. *Rozelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1012-15 (11th

Cir. 2012).

Movant has not demonstrated that any of these exceptions exist.[15]  Thus, all

of his claims are procedurally barred.  Nevertheless, out of an abundance of caution

---

[15]     Even if Movant had argued as cause for the procedural default that appellate
counsel was ineffective for failing to raise these issues of ineffective assistance of
trial counsel, any such argument would fail.  Indeed, appellate counsel could not
have been constitutionally ineffective in that regard because the Eleventh Circuit
does not review ineffective assistance claims unless and until they were first raised
in the district court. *See Milligan v. United States*, 213 F. App'x 964, 966 (11th Cir.
2007) ("Milligan's appellate counsel could not be constitutionally ineffective

and because Movant characterizes his claims as those for ineffective assistance of counsel, I will review them on the merits. In any event, all of his claims fail.

2.     Ineffective Assistance Standard

The standard for evaluating ineffective assistance of counsel claims was set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Green v. Nelson*, 595 F.3d 1245, 1239 (11th Cir. 2010). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 688). To establish deficiency, a petitioner is required to establish that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a petitioner must prove a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 750 (11th Cir. 2010).

---

because this Court would not have heard his claim for ineffective assistance of trial counsel on direct appeal. This Court does not consider claims of ineffective assistance of counsel on direct appeal unless those claims were first raised in the district court[.] . . ."); *United States v. Perez-Tosta*, 36 F.3d 1552, 1563 (11th Cir. 1994) ("It is settled law in this circuit that a claim of ineffective assistance of counsel cannot be considered on direct appeal if the claims were not first raised before the district court[.] . . .").

"An attorney's performance is not deficient in hindsight just because he or she made one choice versus another." *Scott v. United States*, 890 F.3d 1239, 1259 (11th Cir. 2018); *see also Willis v. Newsome*, 771 F.2d 1445, 1447 (11th Cir. 1985) ("Tactical decisions do not render assistance ineffective merely because in retrospect it is apparent that counsel chose the wrong course.").  An ineffective assistance claim should be examined based on the "'totality of the circumstances[,]'" *McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) (citations omitted), and the court may "dispose of ineffectiveness claims on either of its two grounds." *Atkins v. Singletary*, 965 F.2d 952, 959 (11th Cir. 1992); *see also Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").  The *Strickland* standard also applies to claims of ineffective assistance of counsel on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013).

    3.    <u>Movant Has Failed to Demonstrate that Trial Counsel was Ineffective.</u>

As set forth *supra* in Section I.C., Movant raises several grounds of ineffective assistance of counsel.  None has merit.[16]

---

[16]    In Movant's attempt to repackage his arguments challenging the validity of the searches, he attempts to pick apart every minute detail of the bases thereof.  To that end, and because Movant already has had three bites at the apple, I will not address each and every one of his points but instead will endeavor to address the main issues.

a.   The Tower Dump

Several of Movant's arguments that counsel was ineffective are premised on his false assertion that the telephone number ending in 1011 was never listed in the tower dump about which law enforcement, including SA Winn, testified and which resulted in law enforcement targeting Movant as a suspect in the robberies.[17] According to Movant, had counsel properly investigated Movant's "real phone contracts," counsel would have learned that his phone number did not appear in the tower dump results and that SA Winn made a false statement in his application for cell site location data.[18]

---

[17]   Movant actually goes so far as to accuse the Government of forging a fraudulent T-Mobile contract and argues at length that the records of the phone number ending in 1011 was not subscribed to him at the time of the robberies. (*See* Doc. 236 at 17-18). Notably, however, the Government sought and received a court order to obtain records from T-Mobile regarding the phone number ending with 1011, *see* 1:17-MJ-238, and the FBI received responsive records from T-Mobile on April 19, 2017, which states that it was produced in response to that court order. (Doc. 240-1 at 2). That exhibit was authenticated and admitted at trial, and shows that the phone number ending with 1011 was, in fact, registered to Movant during the time period of the robberies, and his address is listed with T-Mobile as 1044 Wenham Lane – the same residence that was searched. (Doc. 215 at 66; Doc. 240-1 at 2; Doc. 174-1 at 2). Finally, the court order specifically states that the tower dump revealed that the number ending with 1011 was in the vicinity of several of the robberies. *See* 1:17-MJ-238 at Doc. 1-1.

[18]   Movant first argues that counsel failed to investigate by not obtaining his phone records [Doc. 236 at 5], but later states that counsel obtained subpoenas for those records too late [*Id.* at 20]. Nonetheless, Movant has failed to show how either alleged failure constituted ineffective assistance.

Movant's argument is nonsensical, as a tower dump shows all phones in a particular location at a particular time, whereas cell site location data also shows the approximate location of a particular phone at a particular time, but provides further details regarding the activity of its user. It necessarily follows that a tower dump and cell site data would show the same results, *i.e.,* that a particular phone was in a particular location at a specific time. Here, the historical cell data for Movant's phone ending in 1011 placed him in the vicinity of multiple robberies; therefore, a tower dump undoubtedly would have shown the same results.[19] Consequently, raising any such argument in the motion to suppress would have been frivolous, and counsel could not have been deficient for having failed to do so.[20] *See Mustafa v.*

---

[19] Movant apparently believes that the fact that SA Winn applied for the historical cell site data the day after he arrested Movant and received that information nearly two months later shows that SA Winn could not have known where Movant was before his arrest on March 30, 2017. (Doc. 236 at 23). As discussed herein, however, the tower dump revealed that Movant's phone number was at the robberies and T-Mobile records identified subscriber information for that phone number as "Cash Pendergrass" – Movant's nickname [*see* Doc. 49 at 82] – with the billing address of 1044 Wenham Lane. Moreover, SA Winn learned that Ms. Jones had told Detective Dorminy that Movant lived with her at the Wenham Lane address, and SA Winn observed Movant and his car at that address.

[20] Movant also argues that counsel should have filed a motion to dismiss the indictment based on the alleged false statements contained in the affidavits for the search warrant. But the remedy for any such deficiency "is for the court to declare the search warrant invalid and suppress the evidence seized pursuant to the warrant." *United States v. Valencia-Trujillo*, No. 8:02-CR-329-T-17-EAJ, 2006 WL 1320248, at *3 (M.D. Fla. May 12, 2006), *aff'd*, 573 F.3d 1171 (11th Cir. 2009). That remedy is exactly what counsel sought.

*Fla. Dep't of Corr.*, No. 23-10029, 2023 WL 4347052, at *1 (11th Cir. June 28, 2023) ("'[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.'") (quoting *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994)).

        b.      <u>Subpoena Witnesses and Records</u>

Other than his phone records, Movant argues that counsel also should have issued subpoenas in order to:  (1) secure witnesses who were present during the search to testify at the motion to suppress hearing and help prove facts from the alleged illegal search; (2) receive a chain of custody log for the evidence bag in Gwinnett County; and (3) receive the chain of custody for the Discount Grocery video.  Movant cannot show that counsel was ineffective in this regard.

Movant first claims that counsel should have subpoenaed Lydia Palmitier, the woman who answered the door on the day of the search, to testify at the motion to suppress hearing because, according to Movant, it "still is unclear to the courts as to what was said at the door that day[.]"  (Doc. 236 at 24).  Movant also argues that Ms. Palmitier did not know Movant's name and could not have told law enforcement that anyone by that name was home.  (*Id.*).  But as noted by the Government, Ms. Jones testified as to what Ms. Palmitier said and did on the day of the search, and directly contradicted Movant's statement that Ms. Palmitier did not know Movant. (Doc. 49 at 166).

Regardless, an attorney's decision whether to call witnesses is "quintessential trial strategy" and thus does not constitute an unreasonable professional decision. *Ball v. United States*, 271 F. App'x 880, 884 (11th Cir. 2008); *see also Ojeda v. Sec'y for Dep't of Corr.*, 279 F. App'x 953, 955 (11th Cir. 2008) (stating that trial counsel's decision not to call alibi witness was strategic decision that the court would not question); *Sanders v. United States*, 314 F. App'x 212, 213 (11th Cir. 2008) (stating that whether to present certain testimonial evidence is a matter of strategy and complaints of uncalled witnesses generally are disfavored).[21]

Insofar as Movant argues that counsel should have sought the "chain of custody" or "chain of view" of video surveillance from the Discount Grocery robbery, he apparently believes that there was different video footage from that robbery that would have shown that it was not his DNA on the floor.  (Doc. 236 at 24).  First, the Government provided to counsel all of the existing footage from that robbery and thus any such request would have been fruitless.  (Doc. 240 at 6, n.2).

---

[21]    As with the T-Mobile documents, Movant accuses the Government of having "doctored" certain CHS reports, which Movant claims counsel should have investigated.  (Doc. 236 at 28).  Movant's argument is convoluted at best, but it appears that according to Movant the "original" documents show only that two phone numbers were indicated from the tower dump – *i.e.*, those of Quinterius Luke and James Rogers, but not him.  (*Id.* at 28, 158-61).  He then claims that the next set of documents [*id.* at 163-70], which lists Movant as a suspect based on the tower dump, was "doctored."  (*Id.* at 28).  Other than his own self-serving statements, Movant provides no support whatsoever for these baseless accusations.

Moreover, it is not clear how any such footage would have been able to negate the expert testimony at trial that the blood on the floor was 690,000,000,000,000,000,000,000,000,000 more likely to be Movant's DNA than DNA from any other person.[22]

      c.   <u>Fourth Amendment Waiver</u>

Movant dedicates many pages to his argument that had counsel properly investigated Movant's case he would have learned that Movant did not have a Fourth Amendment waiver as part of his conditions of probation. Importantly, the Government did not argue in its briefs or during the hearing that officers entered Movant's home on the basis of a Fourth Amendment waiver, and I did not make my determination that the initial search was lawful based on any such waiver.[23] (*See generally* Docs. 49, 62, 80). Instead, I found that based on the totality of the circumstances law enforcement had reasonable suspicion to believe that Movant

---

[22]    Although Movant also argues that counsel should have sought the "chain of custody log for evidence bag in [G]winnett [C]ounty" [Doc. 236 at 5], he does not further elaborate on this issue, it is not clear to which "evidence bag" he refers or how the chain of custody was at issue, and the Government provided a proper foundation for all of the evidence admitted at trial.

[23]    Documents from the GCPD indicate that detectives were under the mistaken impression that Movant did, in fact, have a Fourth Amendment waiver as a condition of his probation. (Doc. 236 at 18). But those officers involved in the March 30, 2017, search did not testify that there was a waiver and/or that any such waiver was the basis for their initial entry into the residence. (*See generally*, Doc. 49).

violated the conditions of probation.  (Doc. 80 at 30).  Thus, the fact that Movant did not have a Fourth Amendment waiver was not relevant to the proceedings, and counsel was not deficient for failing to raise any such irrelevant issue.

d.   <u>Move to Suppress the DNA Evidence</u>

Finally, Movant argues that counsel was ineffective with regard to the DNA evidence.  In particular, Movant claims that counsel should have moved to suppress that evidence because the swabs taken from him were "partially sealed," the chain of custody was broken, and the sample was likely contaminated.  (Doc. 236 at 21). According to Movant, because the DNA evidence linked him to the gun, without that DNA the Government would not have been able to place him at two of the robberies.  (*Id.* at 22).  Movant's argument is misguided.

First, the Government provided testimony about the meticulous procedures for collecting and testing the DNA, that those procedures were followed in this case, and that there was no indication or likelihood that either sample was contaminated. (Doc. 213 at 186-87, 193-95, 213-14; Doc. 215 at 130-33).  Additionally, the evidence against Movant was formidable, and the DNA evidence was only one portion of the "avalanche of evidence" that the Eleventh Circuit found "sufficiently supported [Movant's] convictions *on all five robberies*."  *Pendergrass*, 995 F.3d at 876-77 (emphasis added).

Here, Movant does not argue that probable cause did not support the search warrant for the DNA; instead he insists that counsel – specifically Mr. Spencer – should have challenged the results by hiring a private investigator or his own DNA expert to show that the chain of custody had been broken and the sample had been tampered with.  (Doc. 236 at 21-22, 24-25).  Spencer's failure to do so, argues Movant, left new counsel at a disadvantage to fight or object to the DNA evidence at trial.  (Doc. 236 at 21-22, 24-25).

Contrary to Movant's argument, however, counsel thoroughly cross-examined both the DNA expert and SA Winn at trial in a methodical attempt to discredit the validity of both the samples and the analysis thereof – which demonstrated that counsel was abundantly prepared.  (Doc. 213 at 190- 211, 216-217; Doc. 215 at 169-175).  What's more, Movant's belief that any such expert would have testified consistently with his claims is pure speculation and does not entitle him to relief.  *See, e.g., Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 851-52 (11th Cir. 2016) ("Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [the defendant's] claims is mere speculation and does not entitle him to habeas relief.").

This Court also should not second-guess counsel's decision whether to call an expert witness, which, like lay witnesses, is "the epitome of a strategic decision[.]" *Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1340 (11th Cir. 2019) (internal

quotation marks and citations omitted). And perhaps most importantly, in light of all of the other overwhelming evidence Movant cannot show a reasonable probability that had counsel hired and presented a DNA expert the outcome of the trial would have been different. *See, e.g., Murray v. United States*, No. 16-10403-D, 2017 WL 3391610, at *3 (11th Cir. Mar. 10, 2017) (finding no prejudice where counsel did not obtain an independent DNA expert in light of the other evidence introduced at defendant's kidnapping trial including evidence that, *inter alia*, the defendant made large purchases after receiving ransom money, possessed a car that fit the description of the car that picked up the ransom money, had a mask and gloves in his car that matched those used in the kidnappings, and geo-location evidence linked him to one of the crimes).

In short, counsel investigated, filed, and competently argued motions to suppress – notably succeeding in connection with the search of the contents Movant's cell phone – and Movant's attempt to relitigate those motions under the guise of ineffective assistance claims heartily fails. Indeed, it is evident from the record that counsel thoroughly prepared for, and put on, the best vigorous and strategic defense possible, and counsel is not rendered ineffective simply because that defense failed. And given the overwhelming evidence against Movant, Movant cannot demonstrate a reasonable probability that any of these issues would have changed the outcome of the trial.

4.      Movant's Sentencing Challenges are Baseless.

Movant raises two sentencing claims:   (1) his §924(c) sentences were unlawfully stacked under the FSA; and (2) he was unjustly sentenced to forty-six years of imprisonment when his co-defendant Thomas only received ten years for the same robberies.  (Doc. 236 at 5-7).  It is difficult to determine whether Movant's sentencing claims challenge Court error or ineffective assistance of counsel.  To the degree he argues the former, as discussed previously in Section II.B.I, those claims are procedurally defaulted because Movant did not raise them on appeal.  Insofar as he argues ineffective assistance either on the part of trial counsel or on the part of appellate counsel as cause for the procedural default, his claims are without merit.

a.      Movant's Sentences were not Unlawfully Stacked.

Before the FSA was enacted, §924(c) contained a "stacking" provision which provided that for a second or subsequent §924(c) conviction a defendant was to be "sentenced to a term of imprisonment of not less than 25 years[.]"  18 U.S.C. §924(c)(1)(C)(i) (2017).  That provision applied even if a person was convicted of multiple §924(c) crimes in a single prosecution.  *See United States v. Smith*, 967 F.3d 1196, 1210 (11th Cir. 2020) (stating that before the FSA was enacted, "[t]he Supreme Court had interpreted the 25-year mandatory minimum as applying to second (and third, and fourth, and so on) §924(c) convictions within a single prosecution.") (citing *Deal v. United States*, 508 U.S. 129, 131-32 (1993)).  In other

words, until the FSA went into effect, based on the "stacking" provision defendants convicted of more than one §924(c) crime in one case were sentenced to twenty-five years for each conviction after the first.

Section 403(a) of the FSA, however, "amended the stacking provision such that the 25-year mandatory minimum did not apply to multiple section 924(c) convictions resulting from a single prosecution." *United States v. Griffin*, 859 F. App'x 359,360 (11th Cir. 2021); *see also United States v. Pearson*, No. 22-12447, 2023 WL 2565096, at *2 (11th Cir. Mar. 20, 2023) ("Section 403(a) of the First Step Act amended [the stacking] language so that the 25-year mandatory minimum on a second §924(c) violation only applies if the first §924(c) conviction has become final."). The FSA, however, did not change the language mandating that a sentence under §924(c) run consecutively to any other sentence imposed. 18 U.S.C. §924(c)(1)(D)(ii).

In this single prosecution Movant was convicted of five §924(c) counts – that is, three counts of brandishing a firearm, which carries a mandatory minimum sentence of seven years [18 U.S.C. §924(c)(1)(A)(ii)], and two counts of discharging a firearm [18 U.S.C. §924(c)(1)(A)(iii)], which carries a ten-year mandatory minimum term. (Doc. 164). Prior to the FSA, on the §924(c) counts alone Movant would have been sentenced to 107 years of imprisonment – *i.e.*, seven years plus four consecutive twenty-five year sentences. Instead, Movant was sentenced to

seven years on all three of the brandishing convictions, and ten years for both of the discharge convictions, totalling forty-one years for the §924(c) convictions.  As a result, the Court did not unlawfully stack Movant's §924(c) sentences, and neither trial nor appellate counsel was ineffective for failing to raise this meritless issue.

                  b.    <u>Movant's Sentence was Reasonable Even Compared to Co-Defendant Thomas.</u>

Movant's co-defendant Thomas was charged with only two of the five armed robberies with which Movant was charged, Polo's Taqueria and Discount Grocery. (Doc. 1).  Unlike Movant, Thomas pled guilty to the armed robberies pursuant to a plea agreement with the Government in which the Government agreed to dismiss the two §924(c) counts against him, and he was sentenced on September 12, 2019, to ten years of imprisonment.  (Docs. 142, 142-1, 192).

Movant, however, did not accept responsibility and chose to exercise his right to a jury trial on all ten counts with which he was charged.  These facts alone lead to the conclusion that Movant and Thomas are not similarly situated and that any disparity in sentencing was warranted.  *See, e.g., United States v. Lugo*, No. 22-10812, 2023 WL 254312, at *2 (11th Cir. Mar. 17, 2023) (stating that in determining whether defendants are similarly situated to avoid unwarranted sentencing disparities, "the district court should not draw comparisons to cases involving defendants who . . . pleaded guilty, if those things are not true of the defendant."); *United States v. Thompson*, No. 20-11094, 2021 WL 3877713, at *6 (11th Cir. Aug.

31, 2021) (quoting *United States v. Abovyan*, 988 F.3d 1288, 1311 (11th Cir. 2021)); *United States v. Docampo*, 573 F.3d 1091, 1093 (11th Cir. 2009) ("Because the other conspirators either pleaded guilty and agreed to cooperate or were not prosecuted in federal court, we conclude that they are not similarly situated" to the defendant who was convicted at trial, "and any disparity in sentences is warranted.").

It also cannot be said that Thomas was found guilty of "similar conduct" to Movant, since Movant was charged with, and convicted of, three more robberies than Thomas. During those three additional robberies Movant aimed and shot at a victim outside the Best Wings restaurant, nearly missing his leg [Doc. 204 ("PSR") ¶27], at the Bonita Coin Laundry he grabbed a fourteen-year-old girl at gunpoint and forced her to open a safe in front of her mother [*id.* ¶26; Doc. 214 at 77], and at the China Star restaurant he pointed a gun at an employee while demanding cash from the register [PSR ¶19]. And while Thomas struck the owner of the Discount Grocery with his gun, during that robbery Movant shot the owner point blank in the face multiple times, causing him to suffer from severe permanent injuries. (Doc. 174-2 at 5-7; Doc. 213 at 65-66; PSR ¶¶23, 38). Finally, Thomas was sentenced to ten years for each of the two robberies, whereas Movant was sentenced to five years for all five of them. Based on all of these reasons, Movant's sentence was not substantively unreasonable compared to that of Thomas's, and counsel was not ineffective for failing to raise this issue.

### III.   CONCLUSION

Based on the foregoing reasons, **IT IS RECOMMENDED** that Dontiez Pendergrass's motion to vacate his sentence [Doc. 236] be **DENIED WITH PREJUDICE**.

### IV.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing §2255 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."   28 U.S.C. §2253(c)(2) provides that a certificate of appealability ("COA") may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."   In order for the certification requirement to fulfill its function of weeding out frivolous appeals, a court should not automatically issue a COA; rather, the applicant must prove "something more than the absence of frivolity" or "the existence of mere 'good faith' on his or her part." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (citations omitted).

Movant need not prove, however, that some jurists would grant the §2255 motion. *See id.*   "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *See Lamarca v. Secretary, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009) (citing *Miller-El*, 537 U.S. at 325).   In other

words, Movant need only demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Based on the foregoing discussion, reasonable jurists would not find "debatable or wrong" my determination that Movant's claims are procedurally defaulted and/or without merit. *See Slack*, 529 U.S. at 484.

Accordingly, **IT IS FURTHER RECOMMENDED** that a COA be denied.

Movant's motion for appointment of counsel, as contained in Doc. 245, is **DENIED AS MOOT**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**SO ORDERED AND RECOMMENDED** this 1st day of August, 2023.

_____
JOHN K. LARKINS III
UNITED STATES MAGISTRATE JUDGE